# DOTY ET AL. *v.* LOVE, SUPERINTENDENT OF BANKS.

No. 585.   Argued March 11, 12, 1935.—Decided April 1, 1935.

*Messrs. Charles S. Mitchell* and *Elmer C. Sharp* for appellants.

*Messrs. Hiram H. Creekmore* and *C. Richard Bolton,* with whom *Mr. Clyde L. Hester* was on the brief, for appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

A statute of Mississippi, adopted in 1932, permits the reopening of closed banks upon terms proposed by three-fourths of the creditors in number or in value if the plan is approved by the Superintendent of Banks and confirmed by the Court of Chancery. A bank has been reopened in accordance with this statute. The question is whether contractual rights have been impaired or rights of property annulled in contravention of the provisions of the Constitution of the United States.

The People's Bank & Trust Company of Tupelo, Mississippi, closed its doors on December 24, 1930. In accordance with the statutes then in force (Code of 1930, § 3817), the Superintendent of Banks took charge of the business and proceeded to liquidate it, his action being

subject at all times to the supervision of the Court of Chancery. The bank owed about $200,000 for public moneys on deposit. These were preferred claims under the laws of Mississippi, and were paid in full. It owed for bills payable and rediscounts $457,500, amply secured by collateral. These also were paid in full, the security being unaffected by liquidation or insolvency. Out of the remaining assets, so far as they would serve, the liquidator would have to pay the general deposits (about $1,450,000) as well as any other debts. There was also available for the protection of depositors the personal liability of the shareholders to the extent of the par value of their shares, a liability which under the statute was to be " enforced in a suit at law or in equity by any such bank in process of liquidation, or by the superintendent of banks, or other officer succeeding to the legal rights of said bank." Mississippi Code, § 3815. The share capital of the bank was $200,000, and the personal liability of the shareholders would have added a like amount to the assets if all the shareholders had paid in full.

In the fall of 1932, after about two years of liquidation by the Superintendent of Banks, a movement was started by a large number of depositors to set the bank upon its feet. For help in that endeavor, they had recourse to methods made available by a statute adopted in May, 1932, which is quoted in the margin.* Laws of Missis-

* " Section 1. Be it enacted by the Legislature of the State of Mississippi, That the Superintendent of Banks of the State of Mississippi be authorized to reopen any closed bank, with the approval of the chancery court of the county in which the bank is situated, or of the chancellor in vacation, when at least three-fourths of the general depositors and creditors therein, or any number of the general depositors and creditors therein provided they own at least three-fourths of the deposits in or claims against such bank, agree to the reopening thereof and sign what is commonly termed a ' freezing-of-deposits agreement,' under which they agree to accept repayment of their deposits and claims over a period of years, for the full amount

sippi, 1932, c. 251; supplement to Mississippi Code of 1930, § 3817–1. The substance of the statute is that the Court of Chancery shall have power to reopen a closed

thereof or in reduced amounts, with or without interest, the period over which the deposits and claims are to be repaid and the rate of payment, together with the interest rate, if any, to be determined by the superintendent of banks, provided the superintendent of banks is convinced that such bank is in solvent condition and can repay the depositors the amounts of their deposits in accordance with the terms of the agreement for the repayment of same. But, before any such bank shall be reopened, the entire plan for the reopening of same, and all facts in connection therewith, shall be submitted by the superintendent of banks to the chancery court of the county in which the bank is situated, or to the chancellor in vacation, by proper petition, duly verified, such petition to contain a statement of the assets and liabilities of the bank and such other information as may be necessary to convey to the court or chancellor the true facts with reference to the condition of such bank, and a decree of the court or of the chancellor in vacation obtained approving the plan agreed upon for the reopening of such bank and authorizing the same to be reopened.

" Section 2. When any closed bank has been reopened as herein provided, the general depositors and creditors thereof who have not expressly agreed to accept the repayment of their deposits and claims in accordance with the freezing-of-deposits plan shall be bound to accept repayment of their deposits and claims on the same basis and at the same rate as those general depositors and creditors who have signed the freezing-of-deposits agreement, but this shall not apply to public depositors or to those depositors and creditors holding preferred claims, or secured claims, nor to correspondent banks holding bills payable of the closed bank. Proper provision must be made in the plan for the reopening of such bank to pay public depositors, depositors and creditors holding preferred claims and secured claims, and correspondent banks, on terms acceptable to them, but any arrangement so made shall not operate prejudicially to the rights of the general depositors and creditors of the bank.

" Section 3. That this Act shall not be construed to give the superintendent of banks the right to diminish the assets of a closed bank to the prejudice of the depositors and creditors thereof, and any assets that may be charged out as doubtful or as losses shall be held by the bank and collected for the benefit of its depositors and

bank in accordance with a plan proposed by at least three-fourths of the creditors and recommended by the Superintendent, if the court is satisfied that the plan is feasible and just. Upon the approval of such a plan, assenting and non-assenting creditors shall be required to accept payment in accordance with its terms. The Superintendent shall have no power to diminish to the prejudice of creditors any assets that otherwise would be available for payment. Liquidation by the bank itself, though in a reorganized form, is to be substituted for liquidation at the hands of a statutory receiver.

Resorting to that statute, about eighty per cent of the creditors signed a " freezing-of-deposits agreement " prescribing a time and method for the payment of the debts. The bank, when reorganized, was to have a capital of $55,000 and a surplus of $45,000, a total capital and surplus of $100,000. Shareholders of the old bank, having shares of the par value of $110,000, were to contribute the new capital ($55,000, or 50% of their old holdings) in cash or its equivalent. In consideration of this payment, they were to be released from any other liability on the old shares, though the statutory liability would attach automatically to the new ones if the reorganized bank were to go under. Shareholders not contributing to capital (representing $90,000 of the old shares) were to remain personally liable as if no plan had been adopted. Of the claims against the old bank as distinguished from those against the shareholders, twenty-five per cent were to be assumed by the reopened bank; seventy-five per cent were to be a charge upon certain assets which were

creditors, and all amounts so collected shall be held by the bank to be paid to them in accordance with the agreement for the repayment of their deposits and claims.

" Section 4. That this act shall be in force from and after its passage.

"Approved May 18, 1932."

to be placed in a pool and made to realize what they could. Assets having an estimated value in excess of the liabilities assumed were to be turned over to the reopened bank to enable it to make good its promise. This was the primary source of payment, though the covenant of assumption was to be back of it. Out of the assets so delivered deposits of $5 or less, amounting in all to $3,649.87, were to be paid in full. All other claims then outstanding for deposits or other debts were to be ratably satisfied up to the limit of twenty-five per cent, five per cent at once, and the remaining twenty per cent in five per cent instalments as the assets turned over to the reopened bank were converted into cash, the process of conversion being subject to the supervision of the court. Proceeds of collection in excess of the twenty-five per cent were not to be retained, but were to be paid into the pool. Certain other assets having an estimated value of $45,000 were turned over to the reopened bank for surplus or reserve. This amount was to be repaid out of the net earnings at the rate of $7,500 a year by additions to the pool. No dividends were to be declared upon the shares of the reopened bank till all the liabilities assumed by it had been satisfied completely. The assets deposited in the pool were to be administered by the bank as a trust for the benefit of creditors. Many other details would have to be stated to exhibit the plan fully. For an understanding of the objections the outline given will suffice.

The Superintendent of Banks filed a petition in the Court of Chancery approving the plan and recommending its adoption. Notice of hearing was served by publication upon the 5,000 creditors affected, as well as personally upon some of them selected by the court as representing the interests of all. Only a few creditors opposed the granting of the petition. Some of these withdrew their objections at the close of the hearing with the result that the number of opponents was reduced to six. After

full consideration, the court on May 15, 1933, entered a decree overruling the objections and reopening the bank in accordance with the plan. Two of the objecting creditors appealed to the Supreme Court of the state, invoking the protection of Article I, § 10, and the Fourteenth Amendment of the Federal Constitution. The decree was affirmed, one judge dissenting. 155 So. 331. The case is here upon appeal. Judicial Code, § 237; 28 U. S. C. § 344.

If we look to the surface of the statute and no farther, there is not even colorable basis for the argument that the Constitution is infringed. All that the statute does upon its face is to change the method of liquidation. The assets of the business are to be devoted without impairment or diversion to the payment of the debts. As to this the statute is explicit. Act of 1932, Chapter 251, § 3. In the discretion of the Court of Chancery a reopened bank is to take the place of the state Superintendent for the purpose of gathering in the assets and discharging liabilities. The substitution may not be made unless the court is satisfied that the reopened bank is solvent and able to satisfy the debts to be assumed. Payment of the creditors is still the end to be attained, and resumption of business a means and nothing more. If debts are thereby swollen or assets made to shrink, the outcome is an unlooked for incident of a method of administration conceived to be more efficient than present sale and distribution. The Constitution of the United States does not confer upon the depositors a vested right to liquidation at the hands of a state official. *Gibbes* v. *Zimmerman*, 290 U. S. 326, 332.

The argument will not hold that the necessary operation of the statute is to subject dissenting creditors, who may be as many as one-fourth, to the will or the whim of the assenting three-fourths. The creditors favoring reorganization, though they be ninety-nine per cent, have no power under the statute to impose their will on a minority.

They may advise and recommend, but they are powerless to coerce. Their recommendation will be ineffective unless approved by the Superintendent. Even if approved by him, it will be ineffective unless the court after a hearing shall find it to be wise and just. Upon such a hearing every objection to the plan in point of law or policy may be submitted and considered. The decree when made by the Chancellor will represent his own unfettered judgment. The judicial power has not been delegated to nonjudicial agencies or to persons or factions interested in the event. Like statutes have been upheld by the courts of other states. *Dorman* v. *Dell,* 245 Ky. 34; 52 S. W. (2d) 892; *Milner* v. *Gibson,* 249 Ky. 594; 61 S. W. (2d) 273; *Nagel* v. *Ghingher,* 166 Md. 231; 171 Atl. 65; *McConville* v. *Fort Pierce Bank & Trust Co.,* 101 Fla. 727; 135 So. 392; *Smith* v. *Texley,* 55 S. D. 190; 225 N. W. 307; *Hoff* v. *First State Bank of Watson,* 174 Minn. 36; 218 N. W. 238; *Paul* v. *Farmers & Merchants State Bank,* 187 Minn. 411; 245 N. W. 832.

The Act of 1932 being valid on the surface, the question remains whether it has been so applied or interpreted in the adoption of this plan as to bring out defects that were lurking underneath. *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 289; *Merchants' National Bank* v. *Richmond,* 256 U. S. 635, 637; *Kansas City So. Ry. Co.* v. *Road Improvement District, No. 6,* 256 U. S. 658, 659.

The argument is made that some of the assets of the old bank are placed at the risk of the business of the new one. All this was done for the protection of existing creditors. The finding is that collections are made more promptly and readily by a going concern than by one in liquidation. Cf. *Christensen* v. *Merchants & Marine Bank of Pascagoula,* 168 Miss. 43, 57; 150 So. 375. For illustration, a live bank is much more efficient than a closed one in selling parcels of real estate or in carrying them while unsold at profitable rentals. Adequate pre-

cautions are embodied in the plan to assure the enjoyment of these benefits by the creditors and not by others. It is one of the terms of the decree that none of the profits of the business may be used for the new shareholders until every dollar's worth of assets turned over by the Superintendent has been paid to the creditors or delivered to the pool. The court may intervene upon a showing of unreasonable delay. There is no need to consider whether any of these safeguards might have been omitted without invalidating the plan. We take the record as we find it.

The argument is made that a cause of action upon contract has been destroyed or given away to the prejudice of depositors in that shareholders have been released from their personal liability in return for a contribution of capital to the regenerated business. This is said to constitute a denial of due process or an impairment of contract within the doctrine of *Ettor* v. *Tacoma,* 228 U. S. 148, and *Coombes* v. *Getz,* 285 U. S. 434. The answer is much the same as to the argument last considered. The effect of the release has been to make it possible for the bank to be reopened with the result to the creditors of economies and other benefits that would otherwise be lost. During about two years and a half of liquidation there had been collected from the whole body of the shareholders, representing 2,000 shares, a small percentage only of the total liability. The Superintendent expressed the belief that it might be possible in the course of many years and with great expense and labor to bring collections from these sources to a total of $75,000. Through the method called for by the plan, capital in the sum of $55,000 became available at once as additional security for the obligations assumed by the reorganized business. This capital was supplied by the holders of 1,100 shares, whose maximum liability was $110,000. The liability of

the other shareholders ($90,000 at the maximum) continued unimpaired for whatever it was worth. The Chancellor found from the evidence that in all probability the moneys thus obtained as contributions to capital could not have been collected by judgment and execution, and that the depositors would be the gainers by the substituted form of payment. He reached that conclusion after a trial in the county of the vicinage with his finger on the pulse of neighborhood conditions. On appeal to the Supreme Court his findings were confirmed. Cf. *Smith* v. *Texley, supra,* at p. 195.

In such circumstances it is idle to speak of the release of liability as a gift or a sacrifice of valuable assets. The release was none of that, but a compromise of a liability of uncertain value upon terms beneficial to the creditors. So the trier of the facts has found. The title to the extinguished cause of action was not in the depositors, but in the Superintendent or the bank. If there had been no plan to reorganize, the Superintendent like a receiver might have compromised the cause of action and released it with the approval of the court. His authority was no less because the release was incidental to a project to rehabilitate a business for the good of all concerned. The jurisdiction of the Court of Chancery to give approval to a settlement by a receiver or other officer did not have its genesis in the Act of 1932 or in the procedure there prescribed. It existed in like measure when the liquidation of this bank was begun in 1930 and for many years before. Depositors were chargeable with notice of that power and became subject to its exercise in making their deposits.

In last analysis, then, the appellants' grievance, if they have any, is this and nothing more, that there was error of judgment to their prejudice in the approval of the plan with the compromise of liability as one of its important

features. They refer us to nothing in the record to give support to that contention. The testimony as to the probable results of liquidation without the aid of a reopened bank was not contradicted or discredited. But the result would not be changed if the record in that respect were different. Error of judgment in the compromise of liabilities is not a taking of property or an impairment of contract in derogation of the restraints of the Constitution of the United States.

The appellants make the point that by the Act of 1932 a preference was accorded to the claims of correspondent banks, though such a preference did not exist under the statutes in force when the Superintendent went into possession. A sufficient answer is that in this case the correspondent banks were protected by collateral security which apart from the new preference would have required them to be paid in full.

The appellants also say that their constitutional rights were infringed by those provisions of the plan whereby a preference was granted to the holders of small claims. None of these claims ($3,649.87 in the aggregate) was for more than $5, and many, we were informed upon the argument, were for only a few cents. The Chancellor found by his decree that it would be more economical to pay these accounts in full than to incur the bookkeeping expenses incidental to a calculation of percentages whenever dividends were paid to others. Cf. *Nagel* v. *Ghingher, supra,* at p. 69. The objecting creditors have not been damaged by that feature of the plan.

Finally the appellants say that the proceedings in the Court of Chancery are void for insufficient notice to the depositors and others. A sufficient answer is that the appellants appeared generally and were fully heard upon the merits.

The decree should be affirmed, and it is so ordered.

*Affirmed.*