[Civ. No. 10917. First Appellate District, Division Two.—December 19, 1938.]

CHARLES J. BLUMENTHAL et al., Appellants, v. DI GIORGIO FRUIT CORPORATION (a Corporation), Respondent.

John A. Sinclair and Charles A. Christin for Appellants.

Devlin & Devlin & Diepenbrock and Brobeck, Phleger & Harrison for Respondent.

NOURSE, P. J.—This is an action in equity ·to restrain the payment by defendant of any dividends until the accrued dividends are paid upon preferred shares of defendant's stock held by plaintiffs. The pertinent facts are fairly stated

in defendant's brief as found by the trial court, and we quote as follows:

"Respondent, Di Giorgio Fruit Corporation (herein called the Company), was incorporated December 13, 1920, under Delaware law. It had two classes of stock, one called seven per cent cumulative preferred stock (herein called old 7% stock) and common stock. There were outstanding on December 31, 1933, 65,582 shares of old 7% stock and 482,424 shares of old common stock.

"On December 31, 1933, accrued and unpaid dividends on the old 7% stock amounted to $70 per share—an aggregate of $4,590,740. Its actual earned surplus was then $463,305.50."

On February 23, 1934, the directors proposed a plan of recapitalization to its stockholders which provided for "the creation of a new $3, 'cumulative participating preferred stock' (herein called $3 stock) ranking prior to the 7% stock, both as to dividends and assets. It was to be offered for exchange for the 7% stock share for share, at the option of the holders, who, as a condition, were to cancel the arrearage of dividends. The common shares were to be cut to one-third their number, and the new $3 stock was to participate in earnings with the common. . . .

"Holders of 7% preferred who did not wish to make the exchange were to retain their right to receive payment of the arrearage of dividends to June 30, 1934 ($73.50 per share) before any dividend was paid on the common, but dividends were to be non-cumulative after July 1, 1934, and the stock was renamed '7% preferred stock'. No attempt was made to cancel the accrued dividends.

"On April 24, 1934, the plan was approved at a stockholders' meeting, more than a majority of each class of stock voting for the plan, and the charter was accordingly amended. Only 115 shares of 7% stock voted against the plan.

"Before this suit was filed, 4,902 holders of 59,109 shares (over 90%) of the old 7% stock exchanged their shares for new $3 stock. This carried with it the cancellation of $4,344,511.50 of accrued dividends. The holders of more than 97% of the old common surrendered their shares for one-third the number of new common shares.

"On May 28, 1934, the $3 stock was listed on the San Francisco Stock Exchange. Before this suit was filed, more

than 24,000 shares were there bought and sold. On July 10, 1934, the new common stock was listed and more than 43,000 shares have been traded in.

"Dividends have been regularly paid on the $3 preferred since it was issued—four dividends in all, of which three dividends were paid prior to the filing of this suit.

"On eight separate occasions prior to commencement of this action the company communicated with its stockholders, advising them as to the adoption of the plan, the procedure for exchange, the listing of its stock, and the declaration of dividends on the $3 stock.

"On June 9, 1936, more than two years after the adoption of the plan, the plaintiff, Blumenthal, a stock broker, wrote to some 400 stockholders proposing that they join him in a contingent suit to compel the company to pay $73.50 per share in dividends on the 7% stock before any further dividends were paid on the new $3 stock. Thirteen stockholders (including Blumenthal), holding 489 shares, joined. At the trial the holders of 293 additional shares were joined as plaintiffs. Blumenthal had prior to this, through a dummy, exchanged some of his 7% stock for $3 stock and had sold it on the Exchange, after first collecting the new dividend. He also exchanged his old common stock for new common and sold it on the Exchange. As a broker, he had dealt in the $3 stock for clients without any disclosure of the claims here asserted by him. On June 30, 1936, this suit was filed."

The trial court having rendered judgment for the defendant after a fair and full trial, the plaintiffs have appealed, raising only the question whether the judgment is sound in law. The question on the appeal is properly stated by respondent as follows: "Where the charter of a Delaware corporation permits the creation of stock having priority 'either in dividends or as to assets' over an existing preferred stock, provided the holders of a majority of the existing preferred stock assent thereto, and where such majority assents to an amendment creating a prior preference stock, preferred as to dividends and as to assets, may a non-assenting holder of the original preferred stock, which by the charter was entitled to cumulative dividends and on liquidation to par value plus accrued dividends before payment or distribution to 'any other stock', restrain the payment of current dividends on the newly created prior preferred stock until ac-

crued dividends of $73.50 per share on the original preferred stock shall have been paid?''

The determination of this question depends upon the interpretation to be given to the certificate of incorporation of the company, pertinent provisions of which read: ''Dividends on said preferred stock shall be cumulative, and shall be paid or set apart for payment before any dividend on *any other stock* of the Corporation shall· be paid or set apart, so that if for any quarterly dividend period dividends at the rate of seven per cent per annum shall not have been paid upon or set apart for said preferred stock, the deficiency shall be fully paid or set apart for payment before any dividends shall be paid upon or set apart for any other stock of the Corporation.''

''In the event of the dissolution or liquidation of the corporation, whether voluntary or involuntary, the holders of the said cumulative seven per cent preferred stock then outstanding shall be entitled to receive out of the assets (whether capital or surplus) of the Corporation before any payment shall be made to holders of *any other stock* of the Corporation, both the par value of their respective shares and an amount which shall be equal to the dividends accumulated and unpaid thereon, whether or not earned or declared.''

''The *authorized* amount of the said cumulative seven per cent preferred stock shall not be increased or decreased, nor shall the par value thereof be *increased* or *decreased, nor shall any stock* having preference over or equality with said preferred stock either in dividends or as to assets *be authorized except* in each case with the *affirmative vote* of the holders of not *less than a majority* in amount of the said preferred stock issued and outstanding, cast at an annual or a special meeting duly called and held for such purpose.''

''*The Corporation reserves the right* to amend, alter, change or repeal any provision contained in this certificate of incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.'' (All emphasis ours.)

This is the contract of the parties, and conformably with the accepted principle that a contract must be construed as a whole and that the intention of the parties must be determined from the entire instrument, the trial court properly held that since the articles authorized the creation of other preferred stock having preference over the seven per cent

stock, the words "any other stock" in the paragraph first quoted above, meant the common stock then outstanding "and any other stock which might afterwards be issued, junior to the 7% preferred, but to the issuance of which the 7% stock would not be called upon to consent".

We are in full accord with the written opinion of the trial court on this phase of the case and quote, with our own editing, but with the trial judge's own emphasis, these portions:

"The plaintiffs contend that when the original articles, in defining the preference, say that the 7% cumulative dividends shall be paid *before any dividends on any other stock,* the language is comprehensive enough to put the payment of such accumulated dividends ahead of current dividends on new preferred stock (notwithstanding such new stock otherwise outranks the 7%) as well as on common stock.

"The plaintiffs concede (notwithstanding the same words 'any other stock' appear throughout) that under the reserved powers contained in the articles new stock could be authorized 'having preference over or equality with' their own, by a majority vote of the 7% holders and, therefore, that the $3 stock is senior to their 7% stock as to both dividends and assets, but they make this reservation, viz., that the $73.50 a share dividends accumulated to July 1, 1934, must be paid to the 7% holders before the $3 stock attains its full potency as a prior preference stock, after which payment they admit they fall in behind it. This claim, as indicated at the outset, is based upon the language 'any other stock'.

"The plaintiffs make the further concession that the stripping of the 7% stock of its cumulative attribute (as of July 1, 1934) was legal enough,—this, as well as the creation of the $3 stock, being accomplished by the legal exercise of the reserved powers dealing with a *change in preference* as distinguished from *the destruction of a right.*

"However, in connection with the attempt in the amendment to defer or postpone the payment of the accumulated $73.50 a share the plaintiffs' argument runs thus: the right to these dividends is a vested right (*Morris* v. *American Pub. Utilities Co.,* 14 Del. Ch. 136 [122 Atl. 696]; *Keller* v. *Wilson & Co.,* 21 Del. Ch. —— [190 Atl. 115]) *and* part and parcel thereof is the additional right to receive payment of the $73.50 a share as soon as funds are available for *any* dividend and before payment on 'any other stock'

including that which admittedly, in all other respects, outranks theirs.

"The defendant concedes that the right to ultimately receive the accumulated dividends is one of which the 7% holders cannot be deprived, but the concession goes no further than that, the contention being that the amendment,—adopted pursuant to the reservation respecting preferences as well as to the general reservation contained in Article Eighth,—was competent to put dividends on the $3 stock ahead of the *payment* of these accumulated dividends. The amendment itself recognizes the vested character of the accrued dividends, and contemplates their ultimate payment.

"No authority is cited by the plaintiffs holding that the immediate payment of the accumulated dividends is a matter of *right*, or holding that the postponement of their payment until dividends on senior stock are paid is not a proper subject of amendment under the reserved power dealing with preferences, as is the creation of new senior stock, or the shearing of the cumulative feature. Nor is any authority cited by the defendant directly on the subject, on the other side."

"The decision of this case must, after all, depend upon the meaning of the language. Does the language which is found in several places in the original articles mean what the plaintiffs claim, or does it mean, as contended by the defendant, *the common stock then outstanding and any other stock which might afterwards be issued, junior to the 7% preferred, but to the issuance of which the 7% stock would not be called upon to consent?*

"It is pointed out by defendant with a good deal of force that the 7% stock has no voting power unless (as in this case) new stock is proposed equal or senior to it. The voting power under the original articles (and under the amendment as well) resides in the common stock alone except for new preferred, and defendant supposes a case—which might easily occur—of the creation of a new class or new classes of stock junior to the 7% which might well be accomplished without any notice to the 7% stockholders. Indeed, because of their seniority, it would be no concern of theirs. It seems reasonable that the language 'any other stock' was meant to fit such a case. It seems reasonable, moreover, because if given the meaning contended for by plaintiffs it would be

utterly inconsistent and at war with other provisions of the articles which use the same language 'any other stock' and which, the plaintiffs admit, contemplate the possibility of the creation of new preferred stock.''

■ The appellants complain of the judgment and of the reasons upon which it was based as a too narrow and technical interpretation of their constitutional rights. But, if this criticism has merit, the judgment must, nevertheless, be affirmed upon another ground. That is, the action being in equity, the appellants have wholly failed to make a case justifying equitable relief. When the recapitalization plan was proposed in February, 1934, the company was in serious financial difficulties. The accrued and unpaid dividends on the 7 per cent stock then amounted to more than four and one-half million dollars. The actual surplus was then approximately $463,000. Neither the available assets nor the outstanding liabilities were found by the trial court, but it is conceded that the company, as owner of large tracts of agricultural properties and engaged in the production and sale of agricultural products, was caught in the whirlpool of the prevailing depression. Facing probable bankruptcy and dissolution, the directors proposed the recapitalization plan as the best method appearing to them at the time of saving the company and of saving the interests of the holders of this 7% stock. Whether some other plan might have been better is a question that is not before us. That the proposed plan has been successful to some extent is shown by the continued operations of the company and the payment of substantial dividends to those who accepted the plan and took the $3 preferred stock, and it is obvious from the record that the acceptance of the plan by more than 90 per cent of the holders of the seven per cent stock and by more than 97 per cent of the holders of the common stock was the one thing which made the company able to operate as it has done and able to pay any dividends.

■ At this point we may well interpolate certain elementary principles which are controlling here. The action being in equity to enjoin payments of dividends on the $3 stock is in effect an action to restrain the operation of the entire recapitalization plan. But an injunction will not issue merely to punish one for some wrongful act; it lies to prevent the doing of some act to the *injury* of the complainant. (14 R. C. L., p. 309.) To the same extent that injury or detri-

ment must be proved to support complainant's case, injury and detriment to others may be shown to defeat it. Thus injunctions are seldom granted when they are productive of hardship, oppression, injustice, or public mischief. (14 R. C. L., p. 310.) ▓ Here the record discloses that if the appellants should be given the relief they seek, the company may be forced into liquidation causing great loss to all the consenting stockholders, both common and preferred, and it fails to disclose that appellants would obtain any tangible benefit from such an injunction if granted. They cannot contend that their property has been taken without due process unless they show that the action complained of was to their detriment. Here the record discloses the contrary.

In this respect the case is similar to *Neblett* v. *Carpenter*, 305 U. S. 297 [59 Sup. Ct. 170, 83 L. Ed. Adv. Opns. 193], decided by the United States Supreme Court on December 5th of this year. There several non-consenting stockholders and policy holders in the Pacific Mutual Life Insurance Company sought to restrain the operation of a rehabilitation and liquidation plan proposed by the state insurance commissioner. The Supreme Court there used this pertinent language: ''The petitioners have no constitutional right to a particular form of remedy. (*Gibbes* v. *Zimmerman*, 290 U. S. 326, 332 [54 Sup. Ct. 140, 78 L. Ed. 342]; *Doty* v. *Love*, 295 U. S. 64, 70 [55 Sup. Ct. 558, 79 L. Ed. 1303, 96 A. L. R. 1438].) They are not entitled, as against their fellows who prefer to come under the plan and accept its benefits, to force, at their own wish or whim, a liquidation which under the findings *will not advantage them and may seriously injure those who accept the benefit of the plan.* They are not bound, as were the dissenting creditors in *Doty* v. *Love,* 295 U. S. 64 [55 Sup. Ct. 558, 79 L. Ed. 1303, 96 A. L. R. 1438], to accept the obligation of the new company but are afforded an alternative whereby they will receive damages for breach of their contracts. They have failed to show that the plan takes their property without due process.'' (Emphasis ours.)

Here the appellants have failed to show that liquidation would advantage them, but they have shown that it would seriously injure those who have accepted the plan of recapitalization. They cannot under any theory of equity take advantage of those who, by their acceptance of this plan, have

saved the company from liquidation and thus made it possible for the company at some future time to pay these dividends. For the reasons given the judgment is affirmed.

Sturtevant, J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 18, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 16, 1939.