[No. 27660.  Department One.  July 9, 1940.]

WALTER T. GREATHOUSE, *Appellant*, v. YAKIMA VALLEY
BANK & TRUST COMPANY *et al., Respondents.*[1]

[1]Reported in 104 P. (2d) 337.

*Stephen E. Chaffee* and *B. E. McGregor*, for appellant.

*Hugo F. Luhman* and *Richards, Conklin & Delle*, for respondents.

ROBINSON, J.—On March 1, 1933, at a time when many banks were in a precarious condition, the legislature enacted, as an emergency measure, the bank stabilization act (Laws of 1933, chapter 49, p. 278, Rem. Rev. Stat. (Sup.), § 3293-1 [P. C. § 412-31] *et seq.*). Sections 2, 3 and 4 of the act, pp. 278, 279 (Rem. Rev. Stat. (Sup.), §§ 3293-2, 3293-3, 3293-4 [P. C. §§ 412-32, 412-33, 412-34]), empowered the supervisor of banking

to authorize partial and temporary freezing of deposits. Reorganization was authorized by the next section:

Sec. 5, p. 279. "At the request of the directors of a bank, the supervisor may propose a plan for its reorganization, if in his judgment it would be for the best interests of the bank's creditors and of the community which the bank serves. The plan may contemplate such temporary ratable reductions of the demands of depositors and other creditors as would leave its reserve adequate and its capital and surplus unimpaired after the charging off of bad and doubtful debts; and also may contemplate a postponement of payments as in a case falling within section 2. The plan shall be fully described in a writing, the original of which shall be filed in the office of the supervisor and several copies of which shall be furnished the bank, where one or more copies shall be kept available for inspection by stockholders, depositors and other creditors." Rem. Rev. Stat. (Sup.), § 3293-5 [P. C. § 412-35].

Section 6, p. 279, provides that, if creditors having three-fourths of the unsecured demands shall approve the plan within ninety days after it is filed, the supervisor shall have power to put it into effect.

"Thereupon the unsecured demands of creditors shall be ratably reduced according to the plan and appropriate debits shall be made in the books. . . . If the plan contemplates a temporary postponement of payments, section 2, 3 and 4 shall be applicable, and the bank shall comply therewith and conduct its affairs accordingly." Rem. Rev. Stat. (Sup.), § 3293-6 [P. C. § 412-36].

The appellant relies, to a considerable extent, upon the provisions of § 7, p. 280, which reads as follows:

"A bank for which such a plan has been put into effect shall not declare or pay a dividend or distribute any of its assets among stockholders until there shall have been set aside for and credited ratably to the creditors whose demands were reduced an amount equal to the aggregate of the reductions." Rem. Rev. Stat. (Sup.), § 3293-7 [P. C. § 412-37].

The respondent Yakima Valley Bank & Trust Company, hereinafter called the bank, was in financial difficulties at the time the act was passed, and immediately took advantage of its provisions. Thereafter, at the request of its directors, the supervisor of banking proposed a plan for its reorganization. The bank had, since 1924, maintained a companion corporation, with the same officers, for the purpose of handling real estate loans as trustee. This corporation, which is one of the respondents here, was called the Valima Securities Corporation, and will be hereinafter referred to as Valima. The plan proposed by the supervisor of banking is too long to be quoted. The following is a digest of its salient provisions:

It was proposed (1) that the stockholders should contribute a sum equal to fifty per cent of the par value of the stock owned by them. This sum would amount to seventy-five thousand dollars. (2) That depositors and other creditors should make a ratable reduction of their respective net unsecured deposits equal to sixty per cent of the total amount thereof, in accordance with the terms of a waiver, a copy of which was attached to the plan as exhibit "A." The forty per cent not waived was to become available in cash if and when the reorganization became effective. (3) That funds obtained from the contribution by the stockholders and from depositors' waivers should be used to charge off bad and doubtful assets, and that all assets so charged off should be transferred to, and become the property of, Valima. (4) That fifty-one per cent of the capital stock of the bank should be placed in the hands of Valima for additional security for a loan to be obtained from the Reconstruction Finance Corporation, and for the payment of the waived deposits. All new stock certificates issued should have printed thereon § 7 of chapter 49, Laws of 1933. (5) That Valima should

borrow two hundred and fifty thousand dollars from the RFC, using as collateral the transferred assets and pledged stock. That these funds should be used to acquire other assets from the bank, and the bank should use the sums paid therefor to discharge an existing loan from the RFC exceeding seventy-six thousand dollars and rediscounts with the Federal Reserve Bank of about fifty-four thousand dollars, the remainder to be used to pay depositors the forty per cent made available for immediate payment and to strengthen the bank's cash position. (6) That Valima should issue to the depositors,

". . . in exchange for the percentage of deposits waived by them certificates of participation, evidencing the right of the holders thereof to receive their pro rata share of the proceeds of the liquidation of the assets placed in its hands,"

subject to the prior rights of the RFC; no dividends to be paid upon any stock of the bank until the deferred depositors were paid in full; the net earnings of the bank to be devoted to accumulating a surplus equal to twenty-five per cent of its capitalization, after which such proportion as the supervisor might direct should be paid to Valima. (7) That Valima should liquidate the assets so transferred, repay the RFC loan, retire the certificates of participation, and pay any balance remaining to the bank.

It will not be necessary for our present purpose to digest the remaining fourteen paragraphs of the plan. Of these, paragraph 11, however, will be quoted in full, as it defines the rights which it was proposed that the holders of the participating certificates should have in case the plan was adopted:

"(11) Immediately upon the plan of reorganization becoming effective, Valima Securities Corporation shall issue to each of the depositors who either voluntarily

or by operation of law shall have waived the above required percentage of their respective net unsecured claims against the bank Certificates of Participation representing the total amount of their respective waivers, and entitling the holders thereof to receive from the liquidation of the assets held by the Valima Securities Corporation, after repayment of the loan from the Reconstruction Finance Corporation, an amount equal to such waived amount, with interest on the unpaid portion thereof at the rate of 2% per annum from the date of taking effect of this plan, in the form of pro rata payments to be distributed from time to time out of the proceeds of such liquidation."

Among other things, it is provided in the paragraphs not hereinbefore abstracted that, at any time after five years from the time the plan should become effective, the holders of a majority in amount of the participating certificates might require Valima to sell the remainder of the assets and distribute the proceeds; and that, at any time after the plan had been effective for three years, Valima might sell the assets with the approval of the supervisor and the RFC. It was also provided that the plan might be amended with the approval of the supervisor of banking and the RFC, so long as such amendment or amendments should make no substantial change in the liability of the parties, and it was provided that the plan should go into effect upon the declaration of the supervisor if and when the necessary three-fourths assent should be obtained. The exact wording of a portion of the depositor waiver, referred to in paragraph 2 of the plan and attached to it as exhibit "A," is requisite to an understanding of the questions raised upon this appeal:

"The undersigned, a creditor of the Yakima Valley Bank & Trust Company, Yakima, Washington, which bank is now operating on a restricted basis under the provisions of the Washington Bank Stabilization Act, for the purpose of reorganizing and reopening said

bank and in consideration of said bank making available to the undersigned creditor 40% of the net unsecured claim of said creditor, hereby waives and releases said bank from the payment of 60% of such unsecured claim, and in lieu of said 60% agrees to accept a participation certificate in the amount of said 60% of his claim, to be issued by the Valima Securities Corporation, according to the terms of a plan for reorganization of said bank, of which plan this waiver is a part. Said plan in its complete form as proposed by the Supervisor of Banking of the State of Washington is at the office of said bank, and the signer hereof has read or been informed of the terms thereof, and hereby approves the same."

The plan was amended, in that the RFC loaned Valima about $168,000, instead of $250,000, and loaned $100,000 directly to the bank on its debentures. This was to the advantage of the certificate holders in the amount of $82,000, since the RFC loan had to be paid before they could participate in the returns from the liquidation of the Valima assets.

On February 14, 1934, sufficient consents having been obtained, the plan was put into operation, and participating certificates were issued in the amount of $374,438.95.

After an experience of nearly three years, it became apparent that, although the RFC loan to Valima had been paid, the assets remaining in the hands of Valima could never be liquidated for an amount to pay the participating certificates in full. The earnings of the bank were very low. The participating certificate holders could expect nothing from that source until the RFC debentures were paid and the stipulated surplus built up. A committee was appointed to see what could be done in the way of selling both the Valima assets and the bank and liquidating both corporations.

In August, 1937, a contract was entered into by Valima for the sale of its remaining assets to Securi-

ties Discount Corporation for the sum of $195,000. Included in these assets was fifty-one per cent of the shares of the bank. One of the conditions of the contract was that Valima should secure options on bank stock not held by it sufficient to give the purchaser ninety per cent of the total outstanding stock of the bank when the sale should be completed, the purchase price of this additional stock to be in addition to the $195,000. At the same time, a separate agreement was entered into by Securities Discount Corporation, whereby, simultaneously with its purchase of the Valima assets, including ninety per cent of the bank stock, the bank, through its new stockholders, would sell its assets to the Seattle First National Bank, which desired to establish a branch in Yakima.

In connection with this transaction, the purchaser, for its protection, required that the seller should secure written consent to the sale and a waiver of all right, title, and interest in the assets of Valima and the assets of the bank from the participating certificate holders. It was anticipated that it might not be possible to secure waivers from all of the certificate holders. In anticipation of that contingency, the contract provided:

"TENTH. In the event Valima is unable to secure written waivers from all of the waived depositors of Yakima Bank as provided for in subparagraph 'b' of the first paragraph hereof, Valima may, *at its option,* set up a fund for the benefit of the waived depositors failing to execute such waivers, which fund shall be sufficient in amount to pay said depositors in full, and satisfactory evidence that such fund has been created together with the waivers from the balance of the waived depositors shall be accepted by second party, and the escrow holder, as full performance of the obligations imposed upon Valima by said subparagraph 'b' of the first paragraph hereof." (Italics ours.)

On August 20, 1937, Valima sent out an announcement of the plan to the certificate holders, fully explaining it and containing copies of the proposed waiver and escrow instruction. The waiver contained the following recital:

"This waiver is executed for the purpose of releasing the assets of Yakima Valley Bank and Trust Company and Valima Securities Corporation of or from any of the conditions, restrictions or liabilities imposed thereon by virtue of the terms and provisions of the plan of the supervisor of banking of the state of Washington, for the reorganization of said bank or by the Bank Stabilization Act."

To this waiver, and as an integral part thereof, there was attached an escrow instruction, reading as follows:

"To Valima Securities Corporation:

"The foregoing waiver is handed to you in connection with a contemplated sale of the assets of the Valima Securities Corporation, including certain of the stock of the Yakima Valley Bank & Trust Company now pledged therewith, under an agreement with Securities Discount Corporation dated August 12, 1937. *I understand that in order to effect such sale it will be necessary to incur certain expense and that it may become necessary to set up a fund for the retirement of certain Participation Certificates from whose holders it may prove impossible to procure waivers similar to the one executed by me.* I hereby authorize you to deliver the foregoing waiver to the purchaser of the assets of Valima Securities Corporation upon payment to you of the agreed purchase price therefor. *I further authorize you to pay from said purchase price the expense and create therefrom the fund hereinabove referred to.* It is understood and agreed that said waiver will not be delivered by you unless the amount to become available for distribution to the holders of Participation Certificates, who have signed similar waivers, will be sufficient in amount to pay such certificate holders a sum equal to at least forty per cent (40%) of the principal of said certificates.

"In the event said sale to Securities Discount Corporation fails of completion, the undersigned hereby consents to the similar use and delivery of said waiver subject to the conditions hereof in connection with any other sale of said assets.

"I also hand you herewith the Participation Certificate or Certificates above referred to with full authority to you to fully satisfy and cancel the same upon the payment to me of my distributive share of the proceeds received from the sale of all of the assets of Valima Securities Corporation." (Italics ours.)

A fact-finding committee of the certificate holders made a thorough examination of the proposal, and their written report, in which they unanimously concurred, is an exhibit in the case. They estimated the value of the Valima assets, which it had contracted to sell for $195,000, at $180,675.52. They called attention to the bank's debenture loan from the RFC of $100,000, and with reference to it said:

"In our opinion, the earnings of the bank under the present capital structure will not permit the retirement of these debentures under a period of from twelve to fifteen years, as there has been only $1,000 to date liquidated."

They noted that liquidation over a long period would be costly, involving mortgage foreclosures and various kinds of legal expenses, and called attention to the fact that the inclusion of the bank in the deal made an immediate, advantageous liquidation possible. They concluded with a recommendation that the certificate holders sign the waiver,

". . . since we believe they will by so doing realize substantially more by way of an immediate cash settlement than by continued future liquidation."

Prior to February 11, 1938, the holders of certificates representing ninety-three per cent of the amount outstanding had signed the waiver and escrow instruc-

tion. The transaction was then consummated, and the certificate holders received a forty-three per cent dividend on their certificates. Valima retained, however, out of the sale price of the assets, the sum of $37,976.58, which it earmarked in its records as "Outstanding Participating Certificate Trust Fund."

Walter T. Greathouse, the appellant in this action, held a participating certificate in the amount of $8,165.56. He refused to sign the waiver releasing the assets for sale. Five other certificate holders, with certificates aggregating in amount $5,863.70, did likewise; all of them refusing the forty-three per cent dividend and demanding payment in full. They assigned to Greathouse, and he brought this action to recover the sum of the above amounts.

The plaintiff's principal contentions were, first, that, as to the sums sought to be recovered, he and his assignors still stood in relation to the bank as depositors who had merely temporarily waived payment; and second, that, in any event, they were entitled to payment in full out of the "Outstanding Participating Certificate Trust Fund" set up by Valima; this upon the theory that they were the direct beneficiaries of that fund.

Valima tendered and paid into court forty-three per cent of the amount sued for, and, with the codefendant bank, denied liability for any further payment. The trial court held with defendants, and the matter is here on plaintiff's appeal.

The original waiver was executed by appellant and each of his assignors. It is absolute in its terms. We requote a portion of it:

"The undersigned . . . in consideration of said bank making available to the undersigned creditor 40% of the net unsecured claim of said creditor, hereby waives and releases said bank from the payment of

60% of such unsecured claim, and in lieu of said 60% agrees to accept a participation certificate in the amount of said 60% of his claim to be issued by the Valima Securities Corporation according to the terms of a plan for reorganization of said bank of which plan this waiver is a part."

Clearly, as to the sixty per cent waived, the status of the plaintiff and his assignors as depositors in the bank and creditors thereof was destroyed when they signed the waivers and accepted "in lieu of said 60%" of their claim against the bank the direct obligations of Valima. It is true that the bank was obligated to supply assets to Valima by making certain transfers. This the bank did.

It is further true that the plan contemplated that, when and if the reorganized bank made sufficient net earnings and established a surplus equal to twenty-five per cent of its capitalization, the supervisor of banking might direct that such portion of the additional net earnings as he might deem proper should be paid to Valima (paragraph 6 of the plan); and that this should be done, was insured by the provision that the stockholders in the reorganized bank should receive no dividends until the waived deposits were paid in full. But this was a mere contingency. The bank did not prosper, and such a condition never came about. As we have seen, at the time of the liquidation by sale, the bank had repaid but $1,000 of the $100,000 loan from the RFC, and it was estimated it would take from twelve to fifteen years to discharge that loan. We do not think that these provisions in the plan, by which the assets of Valima might possibly be increased at some future time, contemplated that the bank must remain in business indefinitely.

Appellant, however, takes the position that the waivers were wholly and absolutely null and void, and

that they cannot be set up as a defense. He urges that the bank stabilization act limits the authority of the supervisor to "temporary" reductions of deposit demands only, relying upon the language of the second sentence in § 5 of the act:

"The plan may contemplate such temporary ratable reductions of the demands of depositors and other creditors as would leave its reserve adequate and its capital and surplus unimpaired after the charging off of bad and doubtful debts; and also may contemplate a postponement of payments as in a case falling within section 2."

The respondents, however, point to the extensive powers given to the state supervisor of banking generally, citing *In re Cashmere State Bank,* 169 Wash. 258, 13 P. (2d) 892, and construe the language upon which the appellant relies merely as suggesting methods which *may* be used. They contend that it cannot be that the act contemplated that only temporary reductions can be made, and in this connection call attention to a sentence in § 6 of the act which reads as follows:

"If the plan contemplates a temporary postponement of payments, section 2, 3 and 4 shall be applicable, and the bank shall comply therewith and conduct its affairs accordingly."

The *if* in this sentence, they say, unquestionably implies that something other and different from a temporary postponement of payments may be included in the plan.

Much of the argument in the briefs of both parties is directed to this question. We do not find it necessary to pass upon it in disposing of the instant case, for it is certain that the plan of an absolute release of sixty per cent of the deposits was adopted, and that the plaintiff and his assignors consented to it, signed

the releases, and received benefits therefrom, to-wit, the immediate payment of forty per cent of their demands and a leisurely and orderly liquidation of the slow assets constituting the trust fund instead of their immediate sacrifice.

Furthermore, it appears in evidence that new capital was invested in the stock of the reorganized bank upon the faith of the waivers, and the reorganized bank accepted new deposits upon the representation that the sixty per cent of the old deposits was not a charge against its assets. The plaintiff and his assignors are clearly estopped. The elements of estoppel in the case are even stronger than they were in the case of *Shepherd v. Mount Vernon Trust Co.*, 269 N. Y. 234, 199 N. E. 201, a case quite recently decided by the court of appeals of New York. See, also, the even more recent opinion in *Newman v. Asbury Park & Ocean Grove Bank*, 120 N. J. L. 122, 198 Atl. 286.

▮ The appellant complains that he and his assignors have not had the benefit of the superadded liability; but they, in fact, had the direct benefit of one-half of it (paragraph 1 of the plan). It may well have been that this was a greater benefit than if the bank had been then and there liquidated in the ordinary manner instead of being reorganized. Concerning a similar contention, the supreme court of the United States, speaking through Mr. Justice Cardozo in *Doty v. Love*, 295 U. S. 64, 72, 79 L. Ed. 1303, 55 S. Ct. 558, 96 A. L. R. 1438, said:

"The argument is made that a cause of action upon contract has been destroyed or given away to the prejudice of depositors in that shareholders have been released from their personal liability in return for a contribution of capital to the regenerated business. This is said to constitute a denial of due process or an impairment of contract within the doctrine of *Ettor v. Tacoma*, 228 U. S. 148, and *Coombes v. Getz*,

285 U. S. 434. The answer is much the same as to the argument last considered. The effect of the release has been to make it possible for the bank to be reopened with the result to the creditors of economies and other benefits that would otherwise be lost. . . .

"In such circumstances it is idle to speak of the release of liability as a gift or a sacrifice of valuable assets. The release was none of that, but a compromise of a liability of uncertain value upon terms beneficial to the creditors. So the trier of the facts has found. The title to the extinguished cause of action was not in the depositors, but in the Superintendent or the bank. If there had been no plan to reorganize, the Superintendent like a receiver might have compromised the cause of action and released it with the approval of the court. His authority was no less because the release was incidental to a project to rehabilitate a business for the good of all concerned."

It is true that it was expressly found in that case that the depositors "in all probability" were gainers by the fact that the immediate contribution of a part of the liability was substituted for a liquidation in which actions at law would have been necessary to collect it. But we cannot say that that is not true in the instant case.

Some attempt is made to construe certain language in the plan as retaining the superadded liability as a further security for the holders of participating certificates. But we do not so construe it, and, in our opinion, the acceptance of the Valima certificates "in lieu of" sixty per cent of the claims against the bank destroyed the right to rely upon the superadded liability with reference to such sixty per cent, because by that acceptance the preexisting relation of debtor and creditor as to that proportion of the deposits was *ipso facto* destroyed.

With respect to the appellant's second contention, it will be remembered from what has already

been said that the Securities Discount Corporation, in purchasing the Valima assets, required waivers from the certificate holders of any right, title, or interest which they might have in the assets of Valima or in the assets of the bank, and that, in anticipation that some of the certificate holders might refuse to sign the waivers, it was provided:

"Valima may, at its option, set up a fund for the benefit of the waived depositors failing to execute such waivers, which fund shall be sufficient in amount to pay said depositors in full, etc.,"

and in the waiver and escrow instructions it was recited that it might be necessary to set up such a fund, and authority was asked to do so. The primary purpose of this plan was to furnish the Securities Discount Corporation the protection for which it stipulated as a condition of making the purchase. It is apparent from the record that Valima did not exercise that option, but adopted another plan to insure that protection to the purchaser, to which substituted plan the purchaser agreed. We quote from a supplemental agreement entered into between Valima and Securities Discount Corporation on February 11, 1938:

"SEVENTH: First party has elected to make no payments whatsoever upon any participation certificate until the holder thereof has executed and delivered to said first party a waiver or receipt substantially in the form heretofore executed and delivered to first party by the holders of approximately ninety (90) per cent of the entire face value amount represented by said certificates, or until compelled to pay the same by virtue of the judgment of a court of competent jurisdiction. In consideration of such election first party hereby indemnifies second party and agrees to hold it harmless against any loss or liability of any nature whatsoever, (including costs and attorney's fees which may be expended in the defense of any suit or action), sustained or incurred by reason of

first party's said election. As security for such indemnity and for the purposes and uses hereinafter set forth, first party hereby agrees to create a fund from the proceeds of the purchase price to be paid to first party by second party, which fund shall be in an amount equal to the amount of the face or par value of all unwaived and outstanding participation certificates plus interest accrued thereon, plus the sum of Three Thousand Dollars ($3,000)."

The evidence is clear that the fund of $37,976.58 deposited in the bank by Valima and carried on the bank's ledger as "Outstanding Participating Certificate Trust Fund," was not set up in execution of the option provided for in the original agreement, but in accordance with the substituted plan set out in that paragraph of the supplemental agreement which we have just quoted. If it can be properly called a trust fund, the purpose of the trust is unquestionably to protect and indemnify the Securities Discount Corporation, and it is the *cestui*, not the plaintiff and his assignors. They have no direct interest in the fund beyond the ratable interest which they have in common with the other holders of the Valima participating certificates.

Finally, we are in accord with the supreme court of Alabama which, in considering a statute providing for the reorganization and reopening of insolvent banks in *Ex parte Tennessee Valley Bank*, 231 Ala. 545, 166 So. 1, said:

"But more than this, these statutes are also to be considered in the light of the law applicable to insolvent corporations generally (section 7062, Code 1923), that the assets of insolvent corporations constitute a trust fund for the payment of creditors, which may be marshaled and administered in courts having equity jurisdiction in this state."

If the appellant's contentions should be approved, obviously he and his assignors would obtain more than

their ratable proportion of the assets. The result which the trial court reached, and which we approve, is wholly in accord with the trust fund doctrine, which we have so long and consistently applied in the liquidation and winding up of insolvent corporations, to the end that there may be impartial distributions of assets without any preference to one creditor at the expense of another.

In rejecting appellant's contentions, we have relied chiefly upon the principles applied in the cases hereinbefore cited. There is, however, a large volume of case law upon the subject, which we have investigated and found in substantial accord with the general principles which we have applied herein. As examples, we cite the following cases, selecting only recent decisions dealing with bank reorganizations under statutes somewhat similar to our own bank stabilization act: *Dunn v. Love* (1934), 172 Miss. 342, 155 So. 331, 92 A. L. R. 1323; *Timmons v. Peoples Trust Co.* (1934), 114 W. Va. 618, 173 S. E. 79; *Priest v. Whitney Loan & Trust Co.* (1935), 219 Iowa 1281, 261 N. W. 374; *Dorman v. Dell* (1932), 245 Ky. 34, 52 S. W. (2d) 892; *Lansing Drop Forge Co. v. American State Sav. Bank* (1935), 273 Mich. 124, 262 N. W. 756, 104 A. L. R. 1199; *Holton v. Kansas State Bank* (1936), 144 Kan. 352, 59 P. (2d) 41; *Nagel v. Ghingher* (1934), 166 Md. 231, 171 Atl. 65, 92 A. L. R. 1315; *McSweeney v. Equitable Trust Co.* (1938), 16 N. J. Misc. 193, 198 Atl. 529.

The judgment of the trial court is affirmed.

BLAKE, C. J., MAIN, MILLARD, and SIMPSON, JJ., concur.