### DURKEY et al. v. ARNDT et al.
#### Civil Action No. 113.

District Court, E. D. Wisconsin.
Aug. 8, 1942.

258

M. G. Eberlein, of Shawano, Wis., for plaintiffs.

Brazeau & Graves, of Wisconsin Rapids, Wis., and B. E. Meyer, of Marion, Wis., for defendants.

SCHWELLENBACH, District Judge.

In this case, plaintiffs on their own behalf and for a certain class of depositors of the First National Bank of Marion (hereafter called the Old Bank) seek equitable relief in the form of the appointment of a receiver for the Old Bank, an accounting by the officers and directors of the Old Bank, an accounting from the Trustees of a certain Trust created July 2, 1932, an accounting from the defendant J. E. Arndt Insurance Agency and an accounting from and judgment against The First National Bank in Marion (hereafter called the New Bank), the fixing of the amount of an assessment against the stockholders of the Old Bank and the levying of such assessment, and the allowance of attorneys' fees and expenses.

The named defendants are the two banks and their directors, the Trustees under the Trust of July 2, 1932, the J. E. Arndt Insurance Agency and certain of the stockholders of the Old Bank.

The Old Bank was in existence prior to 1930 and had a capital of $50,000 and a paid in surplus of $10,000. During 1930, after the financial collapse, depreciation in its bond account threatened an impairment of its capital and its seven directors voluntarily contributed to the capital the sum of $21,000 with the thought that such contribution would be sufficient to protect the Bank. However, by February, 1931, it was apparent to the Bank's directors that their previous contribution would not suffice. Like many small banks, this one had done a small insurance business. Here it was through the medium of what was called the J. E. Arndt Insurance Agency. Arndt was cashier of the Bank. An agent's license was secured in this name. An account was maintained in the Bank into which were paid premiums on insurance sold and, from time to time, at about six month intervals, the profits of the agency resulting from commissions earned were transferred to the profit and loss account of the Bank. In February, 1931, the directors of the Bank conceived the ingenious idea of having the J. E. Arndt Insurance Agency solicit the larger depositors of the Bank to transfer their deposits from the Bank to the J. E. Arndt Insurance Agency and take from the Agency non-negotiable certificates of deposit payable thirty days after demand with interest at 4 per cent per annum. There was no legal authority for the issuance of such certificates by the Agency. There was no agreement or declaration of trust. The only assurance given to the depositors was that the directors of the Bank were handling the Agency account and would see to it that the money loaned to the Agency would be repaid. Incredibly enough, in amounts ranging from $500 to $6,000, a total of $53,500 was thus secured by the Agency. The Agency then proceeded to purchase from the Bank, at the prices which the Bank paid for them, certain of the bonds in the Bank's bond account which had been badly depreciated. The actual market value of the bonds at the time was approximately 10 per cent of the amount paid by the Agency to the Bank. This transaction also carried with it the oral agreement by the directors of the Bank that at any time, on the demand of the Agency, the Bank would buy back the bonds at the amounts for which they were purchased by the agency. It was through this process that the Bank was kept open through the year 1931 and the spring of 1932.

On June 22, 1932, the Bank was examined. That examination revealed a net depreciation in the Bank's bond account of $252,953.75. It also revealed a large number of slow loans. The unsecured deposits of the Bank approximated $730,000. To meet this situation, an agreement was drawn up on July 2, 1932, between the Old Bank and the defendants Arndt, Wolf, Zaug and Malueg under which the individual defendants agreed as Trustees for such depositors assenting thereto to accept from such assenting depositors the assignment of 35 per cent of the amounts of their

deposits "for cancellation and discharge by the Bank." The agreement provided that the depositors were to accept payment in installments over a period of four years of 65 per cent of their deposits in the Bank. As security for the 35 per cent, the Bank was to assign to the Trustees "at cost or book value such of its assets as the Bank may desire to dispose of and/or (2) assign and set over to the Trustees any interest, or interests, in such of its assets as may be depreciated or charged off (in whole or in part) on its books of account, in which latter case assignment to the Trustees shall cover only that interest in each asset represented by the depreciation thereof charged off on the Bank's books of account, and in respect to any such item the Bank shall thereafter be entitled to all interest or income received, and to the recoveries of principal up to the amount at which the item shall be carried on the Bank's books of account, and the Trustees shall be entitled to receive from the Bank only such part of the principal recovered thereon as exceeds the amount at which the same shall be carried on the Bank's books." The agreement also gave the Trustees "full authority to hold, collect, exchange, dispose of or otherwise convert of, liquidate any asset which they may require pursuant hereto, and shall have authority in their discretion, and without regard to any limitations imposed by statute in respect to trust fund investments, to invest and reinvest the proceeds thereof." It gave to the Bank "full control and authority over any item as to which it shall have assigned to the Trustees only the interest therein represented by depreciation charged off." It further provided that during the first two years of its existence, the Bank might offer to the Trustees and the Trustees should accept and pay for the depreciated value of any other assets owned by the Bank of which it might desire to dispose. As to such items, the Trustees were given full authority in respect to control, realizations and the investment and the use of the proceeds thereof. The agreement provided that each of the Trustees should execute and deliver to the Bank a bond in the principal sum of $5,000 conditioned upon the faithful performance of their obligations as Trustees. (These bonds were duly executed.) The life of the Trust was to be until July 2, 1942, with the right for an additional ten year extension. Authority was given to the Circuit Court of Waupaca County, Wisconsin, to appoint the successor to any Trustee who might die or resign and to fix the compensation of the Trustees. The agreement further provided: "In consideration of the depositors agreeing to receive their deposits in installments over a period of four years, and in consideration of their waiver of 35 per cent of their said deposits, the Bank agrees with the said depositors that during the life of this contract, it will not pay or declare any dividend or dividends upon its stock." Depositors' agreements accepting the terms and conditions of the foregoing contract were signed by depositors representing 99.6 per cent of all of the depositors in the Bank. Thereupon each depositor received two certificates. One, issued by the Old Bank, covered the 65 per cent of the deposit payable in eight semi-annual payments. The other, issued by the Trustees, covered the 35 per cent of the deposit and was in the following form:

"Participating Trust Certificate
"Issued in Connection with the Trust Created by the
"The First National Bank of Marion
"No. 79—383

"Marion, Wisconsin, July 2, 1932

"This is to certify that ——— is a creditor of the trust created by The First National Bank of Marion, Marion, Wisconsin, and has a claim upon trust property of said trust in the amount of ——— Dollars $——— which said claim is payable prorata from the assets of said trust as realized in liquidation. This certificate is assignable upon the books of the trust by the presentation of this certificate with the endorsement of the holder thereon. No transfer may be made within 10 days prior to declaration of dividend.

"Dated at Marion, Waupaca County, Wisconsin, this 2nd day of July, 1932.

| "Anton Malueg | Wm. E. Wolf | ⎫ | Trustees of Trust created by The First |
|---|---|---|---|
| "Wilbert Zaug | J. E. Arndt | ⎬ · | National Bank of Marion, Marion, Wis., |
| "J. E. Arndt, Secretary | | ⎭ | for the benefit of depositors." |

Between February, 1931, and July 2, 1932, in accordance with the oral contract, the Bank had repurchased from the J. E. Arndt Insurance Agency a sufficient amount of the bonds secured from the Bank to have paid off in full the depositors who loaned their money to the Agency in the amount of $15,300.

Between July 2, 1932, and February 28, 1933, the Bank transferred to the Trustees under the July 2, 1932, Trust, cash in the amount of $28,909.06; various persons notes in the amount of approximately $37,000; two South American bonds, one for $4,712.50 and the other for $4,850; and an interest in the Bank's bond account to the extent that it had been charged off on the books of the Bank in the amount of $196,864.50. These items totaled the amount of the liability of which the Bank had been relieved in the sum of $239,023.51.

Still, however, the Bank's bond account was being subjected to additional depreciation. The examination of December 15, 1932, showed depreciation of $17,901. In the meantime, the amount of slow loans had come up to $188,870.35 and the doubtful ones, to $13,995.95. March, 1933, brought the bank holiday and the passage by the Congress of the emergency banking legislation known as the Bank Conservation Act of March, 1933, 48 Stat. 2, 12 U.S.C.A. §§ 201–213 inclusive. Under authority of this statute, defendant Arndt was appointed conservator by the Comptroller of the Currency and the Bank was operated by him under the provisions of that act. On April 26, 1933, the examination of the Bank disclosed that the depreciation of the Bank's bond account had increased to $32,832.42. The examiner's report showed a deficit in acceptable assets of $60,519.15 and a proposal was made to the directors by the examiner that a further waiver of 10 per cent be required of the depositors who had entered into the agreement of July 2, 1932. The report specifically provided that such waiver should not be asked as to deposits made to the Bank subsequent to July 2, 1932, or to the conservator subsequent to March, 1933. This proposal was never acted upon by the directors. The next examination was made on September 13, 1933. It showed a deficit in acceptable assets of $57,297.07. On October 2, 1933, the Banking Department submitted to the directors the proposal of the elimination from the Bank of items amounting to $135,019.56.

Then the New Bank was to be formed, $60,000 of new capital was to be raised and $28,909.06 cash in the Trustee account was to be used and cash from other sources in the amount of $28,388.01 was to be secured, which would leave the Bank a paid in capital and surplus of $60,000.

Negotiations between the directors of the Bank and the Comptroller's office continued during that time until March 9, 1934. On that date, the Comptroller amended the proposal so as to require the Bank to pledge with the Reconstruction Finance Corporation the unacceptable assets, with the exception of two items amounting to $28,909.06, being the items carried on the books of the Bank as banking house investment and interest earned and uncollectible. As to these two items, the Comptroller required their transfer to the Trust of July 2, 1932, and the payment therefor by the Trustees in cash. This still left a deficit of $28,388.01, necessary to be raised before a position of liquidity could be attained. The directors were instructed to attempt to borrow that sum from the Reconstruction Finance Corporation using the unacceptable assets as collateral. The letter from the Comptroller provided: "In the event that the loan obtained from the R. F. C. is insufficient to enable 100 per cent payment to depositors, the stockholders in the Old Bank shall supply the deficiency." The plan provided that any unacceptable assets not used as collateral to the R. F. C. or remaining after the repayment of the loan to the R. F. C. should be trusteed for the benefit of the Trust agreement "executed in conjunction with the waiver of July, 1932." Prior thereto, the Comptroller had required the execution by the owners of outstanding certificates of the J. E. Arndt Insurance Agency, which then amounted to $31,850, to release the Old Bank from any obligation for those certificates. The owners of those certificates executed a release and acquittal of the Bank upon the written guarantee to them by all of the directors of the Bank of the obligations of the J. E. Arndt Insurance Agency. This transaction was consummated on April 20, 1934. The various requirements of the Comptroller having been met, the Old Bank was turned back to its board of directors by the conservator, 12 U.S.C.A. § 207. On May 4, 1934, the New Bank was organized with additional new capital of $15,000. The directors of the Old Bank sold to the New Bank all of the remaining assets of the Old Bank and the

New Bank assumed all deposit obligations of the old one. Under this arrangement, all deposit obligations, including the balance due over the remaining two-year period under the agreement of July 2, 1932, became immediately payable.

A contract was entered into between the Old Bank and the New Bank under which the New Bank assumed this deposit liability. As a part of the mechanism under this contract, two lists of assets were prepared. The assets acceptable to the Comptroller were designated Class A. They amounted to $179,704.96. The unacceptable assets designated as Class B amounted to $97,426.72. These were used by the Old Bank as collateral for its loan to the R. F. C. The contract between the two banks provided that for a period of six months after the payment of the R. F. C. loan, the New Bank should have a right to return to the Old Bank any of the Class A assets it desired to reject and to receive therefor payment in cash or in exchange such of the Class B assets as it might choose. This contract was also signed by the defendants Wolf, Malueg and Arndt as Trustees. Much confusion has arisen by their designation as Trustees in this contract and the fact that they were also Trustees under the agreement of July 2, 1932. A reading of this contract, dated May 4, 1934, makes plain that these three Trustees were acting only as Trustees for the Old Bank in the handling of the assets designated as Class B. The contract specifically states: "The Trustees above-mentioned are the persons appointed by the directors of the Old Bank to administer and liquidate the unacceptable Class B assets as mentioned herein, such liquidation being for the benefit of the stockholders of the Old Bank."

Notice of the plan of reorganization and explanation thereof was given to the stockholders, depositors and creditors of the Old Bank by the conservator on March 23, 1934. On May 4, 1934, the New Bank got its charter. On June 26, 1934, the board of directors of the Old Bank passed the necessary resolutions for its dissolution. Between that date and June 20, 1936, the two Trusts were handled separately, the items in the July 2, 1932, Trust being handled for the benefit of the 35 per cent depositors. As of June 20, 1936, it had assets of a book value of $11,697.94. The Trust of May 4, 1934, which had been handled for the benefit of the stockholders of the Old Bank, had on that date $66,942.-

26. It was then agreed that the two Trusts would be merged, and that the liability to the holders of participating certificates of July 2, 1932, would be recognized as superior and paramount to any liability to the stockholders. Since the participating certificate liability amounted to $238,900.-64 at that time, any chance that the stockholders had to participate in the assets of either trust was eliminated.

Two dividends have been paid to the holders of the participating certificates. They amounted to 10 per cent or $23,809. The merged trust has been managed by the Trustees since that time. The assets of the Trusts now have a book value of $39,872.41.

This is an action in equity brought largely upon charges of fraud, manipulation, deception and bad faith. I will discuss the details of those charges later. At the outset, I wish to make a few general observations. The transactions which occurred to which objections are made were carried on during the most difficult period of the banking operations in the history of our country. The technique employed was cumbersome and inept. There is, however, a complete absence of the customary badge of fraud; i. e., personal profit accruing to the participants. The directors of this Bank and the Trustees under these trusts not only did not profit personally by the transactions but they were compelled to expend their own money in rather substantial amounts, considering the size of the enterprise, in order to keep this Bank open. Counsel for plaintiff complains that the signatories to the agreement of July 2, 1932, were thereafter viewed as "orphans." What counsel overlooks is the fact that those same signatories had a very definite stake in the continuity of operation of this Bank. Sixty-five per cent of their deposits were at all times in danger. If the Old Bank profited by transactions with the July 2, 1932, Trust, 65 per cent of their deposits profited along with the other deposits. If the New Bank profited as a result of its transactions with the Old Bank, such profit redounded to their benefit to the extent of 65 per cent of the amount they originally had deposited. As a result of the nursing along of the Old Bank and the opening of the New, the entire balance of the 65 per cent of their deposits became available for their use in May, 1934, instead of their being compelled to wait until the period between July 2, 1934, and

July 2, 1936, to receive the last 60 per cent of the amount of their participating certificates.

The most important objective sought by plaintiffs is the levying of an assessment against the stockholders of the Old Bank. They seek such relief upon the theory that the Old Bank went into liquidation under the provisions of Title 12 U.S.C.A. § 181, and that, consequently, the individual liabilities of the shareholders as provided in 12 U.S.C.A. § 63 "may be enforced by any creditor of such association, by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association, against the shareholders thereof, in any court of the United States having original jurisdiction in equity for the district in which such association may have been located or established." 12 U.S.C.A. § 65.

■ To make available the relief granted by Sec. 65, plaintiffs must prove that at the time of the voluntary dissolution (June 26, 1934), the plaintiffs and other depositors in the class whom they represent were creditors of the Old Bank. Concededly, they were creditors as to the 65 per cent of their deposits. That portion of their deposits was paid in full. *Any relief which plaintiffs seek in this action arises out of their claim for losses sustained as to the 35 per cent covered by the stabilization agreement of July 2, 1932.* Unless the status of the 35 per cent on June 26, 1934, was such as to make the plaintiffs creditors as to that percentage of their deposits, plaintiffs are not entitled to relief under Sec. 65. It is true, as plaintiffs point out, that "the shareholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein * * *." 12 U.S.C.A. § 63. That provision, however, is intended only as the measuring stick to be used by the court or by the Comptroller of the Currency in fixing the amount of the assessment. Section 65, upon which plaintiffs rely, specifically names the class of persons who may make use of it and limits that class to "creditor[s] of such association." By the stabilization agreement of July 2, 1932, to the extent of 35 per cent of their deposits, the people whom plaintiffs represent substituted the new obligation of the Trustees for the old deposit obligation of the Bank. Such substitution extinguished the deposit liability. It is true that in order to extinguish an old liability and substitute therefor a new, the consent and agreement of the creditor and of the old debtor and of the new debtor is required. Elkey v. Seymour, 169 Wis. 223, 172 N.W. 138. "Where a third person contracts with a debtor to assume, as an immediate substitution of the debtor's duty to the creditor to render either the performance for which the debtor was previously bound, or some other performance, and the creditor agrees either with the debtor or with the third person to such substitution, there is a novation that discharges the original debtor and subjects the third person to a duty to the creditor." Restatement of the Law, Contracts, sec. 428.

■ "It is not necessary to a substitution of debtors that the assent of the creditor to take a new debtor in place of the old one should be given by any writing or by express words. The fact is the vital thing. If that appears clearly by circumstances and the other essentials also appear, they establish a novation." T. W. Stevenson Co. v. Peterson, 163 Wis. 258, 157 N.W. 750, 752, L.R.A.1918B, 105. The facts of this case are much stronger in support of a substitution than were they in the Stevenson case. Here the depositors signed an agreement assenting to the assignment of 35 per cent of the amounts of their deposits "for cancellation and discharge by the Bank." The agreement provided further that the Bank would not pay dividends upon its stock during the life of the agreement "in consideration of their (the depositors) waiver of 35 per cent of their said deposits." Each of the plaintiffs and all of the parties whom they claim to represent received and accepted the participating trust certificate issued and signed not by the Bank but by the Trustees named in the agreement of July 2, 1932. For a period of two years between that date and the date of the resolution of dissolution, no objection was made by the plaintiffs or by any of the parties whom they claim to represent nor was demand made by any of them for the payment of any part of the 35 per cent of their deposits. These depositors accepted the new obligation from the Trustees in lieu of and as a substitute for the deposit liability of the Bank. Consequently, they were not creditors on the date of voluntary liquidation. They do not qualify under the requirements of 12 U.S.C.A. § 65.

264

Plaintiffs attack the agreement of July 2, 1932, as being unfair and inequitable. Historically, the form of the agreement follows that used by the Supervisor of Banking of the State of Wisconsin under the Wisconsin State Bank Stabilization Statute. Stats. of Wis. Sec. 220.07 (16). That such a contract does no violence to public policy is demonstrated by its adoption and use in the State of Wisconsin. The mandatory provisions of the Wisconsin statute which made such an agreement binding upon all depositors when 80 per cent had signed was approved by the Wisconsin Supreme Court in a carefully considered opinion by Chief Justice Rosenberry in Corstvet v. Bank of Deerfield, 220 Wis. 209, 263 N.W. 687.

Plaintiffs complain that the net effect of the stabilization agreement, coupled with the reorganization of 1934, relieved the shareholders of their statutory liability for assessment. The sale of the assets of the Old Bank to the New Bank was legal. Schofield v. State National Bank of Denver, 8 Cir., 97 F. 282; First National Bank v. Harris, 8 Cir., 27 F.2d 117; City National Bank of Huron v. Fuller, 8 Cir., 52 F.2d 870, 79 A.L.R. 71. The mere fact that the net result was the relieving of shareholders' liability has no relationship to the legality of the procedure used. Doty v. Love, 295 U.S. 64, 55 S.Ct. 558, 79 L.Ed. 1303, 96 A.L.R. 1438.

Plaintiffs object that the agreement of July 2, 1932, was not signed by all the depositors. The percentage of depositors who failed to sign and the percentage which their deposits bore to the total involved (about $6,047.79/$730,000) was so negligible as to have no effect upon the legality of the procedure. Doty v. Love, supra.

Plaintiffs allege that fraud was committed in a number of instances by the shifting of money and bonds from the Old Bank to the Trustees and back and the substitution for money or bonds in the Trust account of assets having little or no value. One of these involves the carrying out of the direction of the Comptroller of the Currency to transfer to the Trust the account of depreciation on the bank building and the item of interest earned but not paid. For these items, $28,909.06 was taken from the Trust and put in the Bank. A complete answer to this was found in the language of the agreement of July 2, 1932. By that agreement, authority was given to the Trustees to do precisely that which is complained of here. It may have been improvident for the plaintiffs and the other depositors to have given that power to the Trustees. Nevertheless, they did give such power to the Trustees. Plaintiffs' counsel characterizes this and other similar transactions as "base manipulations." Whether what was done may properly be called manipulation or astute maneuvering all depends upon the point of view of the one discussing the transaction. It is my belief, after hearing the testimony and reading and examining the exhibits, that it might best be said that these directors muddled through to a successful conclusion under which they protected 65 per cent of the plaintiffs' deposits. I have carefully examined the examiner's report of June 22, 1932. It is my opinion that in the face of the situation that existed then, these plaintiffs were extremely fortunate in receiving 68½ per cent of their deposits. Many banks in much better condition on that date than this one paid very much lower percentages to their depositors.

Plaintiffs allege that fraud was committed in that an item of $2,800.69 was taken out of the Trust fund and delivered to the New Bank for assets of little or no value. They complain that the New Bank received securities of a value of $8,908.15 for which the New Bank only paid $3,296.35. These items did not involve the Trust of June 2, 1932. The transfers were made in conformity with the agreement of May 4, 1934. There was no obligation upon the part of the directors of the Bank to turn any part of the 1934 Trust over to the Trustees under the 1932 Trust. The mere fact that in 1936 they did turn them over does not give the cestuis under the 1932 Trust any right to inquiry into the management of the 1934 Trust. Certainly they cannot now upset the agreement of May 4, 1934.

Plaintiffs allege further fraud in that the defendant Arndt "has misappropriated large funds for his own use and unlawfully received sums as salary and caused the assets of said Trust to be dissipated." The large sums which Mr. Arndt received were allowed by the Circuit Court of Waupaca County. This was in conformity with paragraph 5 of the agreement of July 2, 1932. They were for a salary for one year at $100 a month, two years at $50 a month and two years at $30 a month. This is for the time since Mr. Arndt left the employ of the New Bank. The other Trustees got paid at the rate of a dollar a month during

part of the time and three dollars a month during the remainder. The sums were not large, and they are not unlawful. No one can honestly say that they dissipated the assets. Plaintiffs contend that these defendants should have stopped receiving salary with the commencement of this action in 1938. Plaintiffs sought no temporary restraining order or injunction in this case. I know of no rule of law which will prevent an individual from receiving a meager amount of salary just because he happens to be sued and charged with fraud by someone else.

A large part of the time of the trial was taken up in the introduction of testimony concerning the transfer of bonds to the J. E. Arndt Insurance Agency and back to the Bank or to the Trustees under the Trust of July 2, 1932. I have previously indicated that I consider the use of the Insurance Agency as unique. The issuance of what amounted to certificates of deposit by this Agency probably would have subjected the directors of the Old Bank to severe criticism by any of the holders of such certificates who might have complained. This action is not brought on behalf of the holders of such certificates. It may be that the holders of such certificates would be subject to an action for 35 per cent of the amount which they each received between July 2, 1932, and May 4, 1934. This on the theory of preference. The total amount paid to the holders of the Agency certificates between those two dates was $6,350. Thirty-five per cent of that would be $2,222.50. The plaintiffs are not here suing on that theory. They are not asking judgment against the Trustees or the directors upon that theory. This court would have no jurisdiction to entertain such a suit. The amount involved is not sufficient nor is there the requisite diversity of citizenship. 28 U.S.C.A. § 41 (1). The mere fact that in another phase of this action the plaintiffs assert a right created by the laws of the United States does not give this court jurisdiction over other phases of the case. A right created by the laws of the United States must be an element and an essential one for the plaintiff's cause of action. Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70. The district courts of the United States are courts of limited jurisdiction. The presumption is at every stage of the cause that the court is without jurisdiction unless the contrary appears from the record. Lehigh Mining and Manu-

facturing Company v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444; United States v. Green, 9 Cir., 107 F.2d 19. The Congress has dealt sparingly with its power to confer jurisdiction upon the district courts. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183.

There can be no doubt from the testimony that the directors and officers of the Old Bank transferred bonds in and out of the Agency account and shuffled them back and forth between the Agency and the Bank and the Trust account under the 1932 agreement. Particular stress is laid upon the purchase and repurchase of three South American and two Public Utility bonds. Under the arrangement I have previously described, these bonds were purchased by the Agency from the Old Bank for the Bank's purchase price of $22,870.75. The market value of these bonds at the times they were purchased was $5,175.00. Then, as the holders of the Agency's certificates of deposits wanted their money back, the Bank repurchased them for the amount it had received. As to two of them (State of San Paula and State of Rio Grand du Sol) the repurchase was made after July 2, 1932, and the bonds were put in the Trust account. Plaintiffs' theory as to these bonds is that the court should not relieve "the officers of this Bank and the co-partners in the J. E. Arndt Insurance Agency from paying back the enrichment which it thus got by this circuitous route." The Agency was not enriched by these transactions. It purchased these bonds for many times their market value. It got back precisely what it paid. The placing of these bonds in the Trust account was no different than the placing of any of the Bank's other bonds in that account. It was expressly authorized by the agreement of July 2, 1932. It may be that as to the San Paula and Rio Grand bonds the proper entries were not made on the Bank's books to show that the Bank first took back the bonds from the Agency before it transferred them to the Trust. That objection goes only to the form of the transaction. It does not affect the substance of it. The record is devoid of any evidence showing that the Bank or the Trust sustained any loss as a result of these transactions or that the Trustees or directors derived any profit. The fact is that when, on April 18, 1934, the directors became personally liable for the ob-

ligations of the Insurance Agency, the holders of the outstanding certificates on that date amounted to $31,850. The book value of the assets remaining in the Agency were only $27,454.47. An accounting by the directors and Trustees unquestionably would show a net deficit on their part so far as the Agency was concerned. Granting relief on this phase of the case would avail the plaintiffs nothing.

 In this opinion I have not discussed the numerous decisions cited by plaintiffs in their voluminous briefs. Nonetheless, I have examined them. I accept the plaintiffs' theory as to the broad powers of an equity court to correct abuses and to afford a remedy to those who have suffered through the dereliction of those who had the responsibility to protect them. I assume plaintiffs are correct when they expound the argument that it is this court's function to afford protection to depositors in a National Banking Association. On the other hand, in a case such as this, the must requirement before the plaintiffs can prevail is proof that because of the acts of which they complain they sustained a loss. There is no such proof here. I have read the testimony many times. I have made minute examination of the exhibits. They show conclusively that these defendants diligently and at great expense to themselves sought to protect the interest of these plaintiffs. My search has failed to reveal any element of the fraud upon which these plaintiffs rely.

This action will be dismissed.