PAINE *v.* FOX *et al.*

STATE *ex rel.* ROBERTSON, SUPERINTENDENT OF BANKS, *v.*
BANK OF SEVIERVILLE.

*(Nashville,* December Term, 1937.)

Opinion filed Jan. 18, 1938.

A. M. PAINE, of Sevierville, and JENNINGS & O'NEIL, of Knoxville, for A. M. Paine, guardian.

ROBERTSON & WYNN, and GEO. L. ZIRKLE, all of Sevierville, for Taylor Fox *et al.* and Bank of Sevierville.

Frantz, McConnell & Seymour, of Knoxville, for D. D. Robertson, Superintendent of Banks.

Mr. Chief Justice Green delivered the opinion of the Court.

The first of these cases was a suit brought by the guardian of Ellen Snapp, a person of unsound mind, seeking permission of the court to trench on the *corpus* of her estate. The bill further sought a recovery against the Bank of Sevierville and against Roy Marshall as trustee of certain funds of the Bank of Sevierville upon certificates of deposit issued by that bank to Ellen Snapp. Later this case was consolidated with the case of *State ex rel. D. D. Robertson, Superintendent, v. Bank of Sevierville.* The last-named case was the ordinary suit by the superintendent of banks for winding up the Bank of Sevierville as an insolvent institution.

Two amendments and supplemental bills were filed by Paine, guardian, attacking as void and irregular a certain reorganization plan approved by the chancellor in which the Bank of Sevierville was permitted to reopen upon conditions hereafter appearing. The chancellor dismissed the bill in *Paine, Guardian, v. Fox et al.,* in so far as that bill involved the reorganization of the Bank of Sevierville, and from the decree in this aspect Paine, guardian, has appealed. The decrees of the chancellor in so far as they involved the handling of the ward's estate—trenching on the estate and like matters —are not brought before this court. The appeal was taken directly to this court on account of certain constitutional questions involved.

In January, 1933, the superintendent of banks filed his bill, under the statute, to administer the affairs of

the Bank of Sevierville as an insolvent institution. The superintendent was appointed receiver and proceeded with the liquidation of the institution.

In September, 1933, a plan of reorganization for the closed bank was presented to the chancellor, approved by three-fourths of the creditors in amount, two-thirds of the stockholders of the bank, and also approved by the superintendent of banks. Upon consideration of this plan the chancellor approved it and directed that the Bank of Sevierville be reopened after fifteen days' advertisement as required by statute. These proceedings were had under authority of chapter 107 of the Public Acts of 1933 carried into Williams' Annotated Code at section 6055.13 *et seq.*

The plan of reorganization proposed to the chancellor and adopted by his decree was as follows:

"The total deposits of the Bank of Sevierville as of July 31, 1933, amount to $338,884.65. The deposits of $25.00 or less amount to $9,161.53, which leaves a balance of $329,723.12 of deposits over $25.00 sixty percent of which amount to $197,833.87.

"The present capital stock outstanding is $50,000.00, being 500 shares of the par value of $100.00 per share. By reducing the par value of the present outstanding shares from $100.00 to $10.00 by charter amendment the liabilities of the Bank of Sevierville are reduced $45,000.00; by similar amendment 2500 new shares of stock at $10.00 per share will bring the capital stock of the Bank of Sevierville back to $30,000.00, thereby making 3000 shares of capital stock of $10.00 par value outstanding. The present stockholders will be given the opportunity of buying the 2500 new shares to be issued by giving checks drawn upon their deposits in the Bank

of Sevierville, which checks will be accepted in payment thereof.

"All of the depositors of the Bank of Sevierville whose balances are $25.00 and less, amounting as set out above to $9,161.55, will receive from the reorganized and reopened bank payment of their deposits in full upon the reopening. Depositors and creditors whose deposits amount to more than $25.00 will be asked, and it is understood that they have already agreed in writing, to contribute 40% of their deposits and/or claims and receive after the reopening of said bank Certificates of Deposit issued by the reopened and reorganized bank for the remaining 60% payable in equal installments on or before twelve, eighteen, twenty-four and thirty months from date of issuance, without interest, said Certificates of Deposit to be issued within ten days after the reorganization and reopening of said Bank.

"There is approximately $7,000.00 in undivided profits of the Bank of Sevierville. It is agreed and understood that in order that the bank may be on a sound basis that said undivided profits may be charged off to take care of losses and doubtful items which have been and will be charged off. The 40% of deposits in excess of $25.00 amounts to $131,800.25 and said sum, together with the $45,000.00 represented by the reduction of the par value of the old capital stock, will stand also as a fund against which will be charged doubtful items and assets which will be taken from the investment accounts of the old Bank.

"It is agreed that said doubtful items and assets will thereupon be placed in the hands of Trustees to be appointed by the Chancery Court of Sevier County, Tennessee, whose duty it shall be to liquidate said doubtful

items and assets and apply the proceeds therefrom to the repayment of depositors whose claims are reduced 40%, and if said depositors shall be paid in full the excess shall go *pro rata* to holders of the old capital stock which has been reduced from $100.00 to $10.00 par value per share, provided that at the discretion of the Chancery Court for Sevier County Tennessee, said assets in the hands of the said Trustees shall be used for the purpose of reimbursing the reorganized and reopened bank for any loss it may sustain by reason of the assets turned over to it upon the reopening having become worthless at any time before the maturity of any of the Certificates of Deposits issued upon the reopening to the old depositors."

Chapter 107 of the Public Acts of 1933 is attacked as unconstitutional upon several grounds which will be noticed. The act provides that any banking corporation that may be in the hands of the superintendent of banks for liquidation may be reorganized and reopened upon prescribed conditions. These conditions are to be approved by the superintendent of banks as being in the public interest and as being fair and equitable to creditors and stockholders. The proposed plan of reorganization, in addition to the approval of the superintendent of banks, must be approved by the chancellor having cognizance of any cause in which the affairs of the bank are involved. The plan must be approved by creditors representing at least 75 per cent. in amount of the bank's liabilities and by stockholders owning at least two-thirds of its outstanding capital stock, "such approval and consent to be evidenced in writing." The claims of creditors entitled to payment in full are not to be included among the liabilities of the bank in determining the 75 per cent. thereof.

Section 3 of chapter 107 of the Public Acts of 1933 is as follows:

"Whenever any proposed plan for reorganization or reopening shall have become effective, as provided herein, all depositors and other creditors and stockholders of such banking corporation whether or not they shall have consented to such plan of reorganization or reopening, shall be fully and in all respects subject to and bound by its provisions, and claims of all depositors and other creditors shall be treated as if they had consented to such a plan of reorganization."

The act of 1933 contains certain other provisions not necessary to be mentioned in this connection. This act became effective on April 20, 1933, after the bank had closed and had been taken in charge by the superintendent of banks as receiver in January, 1933.

It is insisted that the act of 1933 violates the provisions of article 1, section 10, of the Federal Constitution, and the like provisions of article 1, section 20, of the Constitution of the State of Tennessee, prohibiting laws impairing the obligations of contracts and prohibiting retrospective laws. It is further insisted that the act violates section 1 of the Fourteenth Amendment to the Federal Constitution and section 8 of article 1 of the Constitution of Tennessee prohibiting the taking of property without due process of law and contrary to the law of the land, etc.

These questions raised by the guardian are no longer open for debate. Statutes similar to chapter 107 of the Public Acts of 1933 have been upheld in many of the states. A statute of Mississippi, of like import with the act of 1933, was sustained in the Supreme Court of the United States against the identical assaults made upon

the act before us and just above indicated. *Doty* v. *Love*, 295 U. S. 64, 55 S. Ct. 558, 561, 79 L. Ed. 1303, 96 A. L. R., 1438.

■ Inasmuch as the Supreme Court of the United States is the final arbiter of questions involving the contract, retrospective law, due process, and equal protection provisions contained in both State and Federal Constitutions, we must regard the decision in *Doty* v. *Love, supra,* as conclusive upon such points made in this case. In *Doty* v. *Love,* speaking of the Mississippi statute, the court said:

"All that the statute does upon its face is to change the method of liquidation. The assets of the business are to be devoted without impairment or diversion to the payment of the debts. . . . In the discretion of the court of chancery a reopened bank is to take the place of the state superintendent for the purpose of gathering in the assets and discharging liabilities. The substitution may not be made unless the court is satisfied that the reopened bank is solvent and able to satisfy the debts to be assumed. Payment of the creditors is still the end to be attained, and resumption of business a means and nothing more. If debts are thereby swollen or assets made to shrink, the outcome is an unlooked-for incident of a method of administration conceived to be more efficient than present sale and distribution. The Constitution of the United States does not confer upon the depositors a vested right to liquidation at the hands of a state official. . . .

"The argument will not hold that the necessary operation of the statute is to subject dissenting creditors, who may be as many as one-fourth, to the will or the whim of the assenting three-fourths. The creditors

favoring reorganization, though they be 99 per cent. have no power under the statute to impose their will on a minority. They may advise and recommend, but they are powerless to coerce. Their recommendation will be ineffective unless approved by the superintendent. Even if approved by him, it will be ineffective unless the court after a hearing shall find it to be wise and just. Upon such a hearing every objection to the plan in point of law or policy may be submitted and considered. The decree when made by the chancellor will represent his own unfettered judgment. The judicial power has not been delegated to nonjudicial agencies or to persons or factions interested in the event. Like statutes have been upheld by the courts of other states. *Dorman* v. *Dell,* 245 Ky., 34, 52 S. W.(2d), 892; *Milner* v. *Gibson,* 249 Ky., 594, 61 S. W. (2d), 273; *Nagel* v. *Ghingher,* 166 Md., 231, 171 A., 65, 92 A. L. R., 1315; *McConville* v. *Ft. Pierce Bank & Trust Co.,* 101 Fla., 727, 135 So. 392; *Smith* v. *Texley,* 55 S. D., 190, 225 N. W., 307; *Hoff* v. *First State Bank,* 174 Minn., 36, 218 N. W., 238; *Paul* v. *Farmers' & Merchants' State Bank,* 187 Minn., 411, 245 N. W., 832, 84 A. L. R. 1466.''

Continuing, the court pointed out that, although the assets of the old bank were placed at the risk of the new one, this was done for the protection of existing creditors and that collections were made more promptly and readily by a going concern than one in litigation.

The Mississippi statute had been previously upheld by the Supreme Court of that state in the case of *Dunn* v. *Love,* 172 Miss., 342, 155 So. 331, 92 A. L. R., 1323.

In addition to the cases from courts of several states cited above by the Supreme Court, there are a number of other decisions of courts of last resort upholding the

validity of statutes similar to the act of 1933. Among these are *Lansing Drop Forge Co.* v. *American State Savings Bank,* 273 Mich., 124, 262 N. W., 756, 104 A. L. R., 1199; In *re Mechanics Trust Co.,* 119 N. J. Eq., 141, 181 A. 423; *Priest* v. *Whitney Loan & Trust Co.,* 219 Iowa, 1281, 261 N. W., 374; *Corstvet* v. *Bank of Deerfield,* 220 Wis., 209, 263 N. W., 687. Other kindred cases are collected in notes, 92 A. L. R., 1337, and 104 A. L. R., 1203.

As stated by the Supreme Court, no depositor has a constitutional right to have the affairs of an insolvent bank liquidated by a superintendent of banks or like official. The cases cited point out that these statutes merely provide a new method of liquidation, provide a new remedy for depositors and creditors, and do not affect constitutional rights of such parties. This is an answer to the argument that statutes of such nature are retrospective and impair the obligations of contracts, and violate other constitutional provisions.

Apart from the attack on the validity of chapter 107 of the Public Acts of 1933, the complainant here urges that several features of the particular plan adopted for the reorganization of the Bank of Sevierville deprive his ward of vested rights.

First it is urged that that portion of the plan crediting stockholders of the new bank, on their subscriptions for stock, with 10 per cent. of the value of their stock in the old bank, is a preference of stockholders of the old bank over creditors of the old bank in the distribution of the assets of that concern. We do not follow this argument at all. So far as we can see, no transfer of assets to represent this stock was made. The whole thing appears to be a paper transaction; an in-

ducement to stockholders of the old bank to subscribe to stock in the new bank. Stockholders in the new bank, no more than stockholders in any other corporation, could participate in the assets of the new bank until all creditors of that bank were paid. It is possible, should the new bank become insolvent, a question might be made by creditors of that concern as to whether its stockholders had properly and fully paid up their subscriptions.

Another feature of the plan criticized is that part which allows depositors in the old bank to pay their subscriptions to stock in the new bank with checks drawn upon the old bank. The plan of reorganization, as heretofore set out, does not make the procedure adopted quite clear. As a matter of fact, depositors in the old bank were only allowed so to draw out 60 per cent. of their deposits. Such withdrawals being so restricted, the reduction of assets reduced the claims participating by the same amount and nonsubscribing depositors of the old bank were in no respect hurt.

It is again urged that the provision in the plan permitting the payment in full of depositors, whose claims amounted to $25 or less, is an unlawful discrimination against other depositors. Most of the bank reorganization plans that we have seen contain a similar provision and such provisions have been uniformly approved. The courts have found that the bookkeeping and other clerical work incident to making a *pro rata* distribution among a multitude of small depositors would add much to the expense of administering an insolvent bank. Such expense would ultimately be borne by the bank's creditors, and they would not profit by an effort at *pro rata* distribution among creditors of this

class. This was expressly recognized by the Supreme Court in *Doty* v. *Love, supra.*

■ Objection is also made to so much of the plan as provides that at the discretion of the chancery court for Sevier county, Tenn., the assets that go into the hands of the trustees ''shall be used for the purpose of reimbursing the reorganized and reopened bank for any loss it may sustain by reason of the assets turned over to it upon the reopening having become worthless at any time before the maturity of any of the certificates of .deposit issued upon the reopening to the old depositors.''

The superintendent of banks and the chancellor were evidently concerned to insure the solvency of the new bank, to secure the payment of the 60 per cent. of the deposits of the old bank which the new bank had assumed. Transferring assets under these conditions and under the eye of the chancellor from the trustees to the new bank does not seem to us prejudicial to the complainant's ward. The new bank will also hold these assets as a trustee for her benefit. It is like taking money out of one pocket and putting it into another. At most, there is nothing here but an exercise of discretion on the chancellor's part, and we cannot see that he abused· this discretion or failed to exercise it for the benefit of the creditors.

■■ It is also objected that the complainant and his ward received no notice of the proceedings in the chancery court when the plan of reorganization was adopted. The plan, however, was presented by the superindendent of banks, acting as receiver of the old bank, and thus representing all creditors. 23 R. C. L., 8; 53 C. J., 137.

Furthermore, chapter 107 of the Public Acts of 1933 provides for fifteen days' publication of any reorganization plan after it is approved by the chancellor and before it is put into effect. This advertisement was duly made, and the complainant and his ward and all other parties interested might have appeared before the chancellor and urged any objection they had to reorganization before it became final.

Some other points are made which we have considered but do not regard them as requiring discussion. Complainant's bills in this case seek to set aside the whole plan of reorganization, to have such plan declared void and ineffective, and to hold the Bank of Sevierville, the superintendent of banks, and the trustees all liable for the full amount of this ward's certificates of deposit in the old bank. It was stated at the bar of this court, and the brief filed for complainant concedes, that complainant has now received from the new bank the 60 per cent. of his ward's claim against the old bank to which she was entitled under the reorganization plan. That is to say, she has accepted the benefits of this reorganization plan and taken under it.

This is an insuperable barrier to any recovery on behalf of the ward in a suit like this. In *O'Bryan Bros.* v. *Glenn Bros.*, 91 Tenn., 106, 17 S. W., 1030, 1031, 30 Am. St. Rep., 862, creditors filed a bill attacking a certain deed of trust as invalid under the general assignment statute then prevailing. Later these same creditors dismissed their bill and sought the execution of the trust and claimed their rights under the trust deed. They were repelled by this court, and it was held that, having distinctly and unequivocally renounced the benefits of the deed of trust, they could not thereafter claim any

of the benefits of said instrument. Among other things
the court said:

"One entitled to a benefit under an instrument, wheth-
er it be a will or any contract, if he claims; the benefits
of such instrument, he must abandon every right the
assertion whereof would defeat even partially the pro-
visions of the instrument. A party cannot occupy in-
consistent positions, but will be confined to his election."

The case before us is much stronger against any
change of position than was that of *O'Bryan Bros.* v.
*Glenn Bros.* In the earlier case no injury was sustained
by any one in consequence of the filing of the bill attack-
ing the trust deed. If the bill in the present case were
sustained and the reorganization plan set aside, grave
injury would be worked upon numerous parties.

■ And, upon another familiar principle, the com-
plainant is not entitled to maintain this suit for his
ward. The reorganization scheme was a plan in the na-
ture of a compromise between this old bank and its cred-
itors, which compromise it appears that the complainant
for his ward has ratified by accepting the benefits there-
of. A rescission of such settlement cannot be had with-
out a tender by the complaining party of the amount re-
ceived thereunder.

The decree of the chancellor is accordingly affirmed.