In re The Matter of the LIQUIDATION OF UNITED AMERICAN BANK IN KNOXVILLE, A Tennessee Corporation.

Supreme Court of Tennessee, at Knoxville.

Sept. 8, 1987.

Rehearing Denied Nov. 2, 1987.

George W. Morton, Jr., Morton, Lewis, King & Krieg, Knoxville, Thomas S. Richey, Powell, Golstein, Frazer & Murphy, Atlanta, Ga., Michael B. Burgee, Ann Du-Ross, Lawrence F. Bates, Rex R. Veal, Jane Rossowski, Federal Deposit Ins. Corp., Knoxville, for Federal Deposit Ins. Corp.

L. Ceasar Stair, III, Berstein, Susano & Stair, Knoxville, Robin L. Hinson, A. Ward McKeithen, Dan T. Coenen, Robinson, Bradshaw & Hinson, Charlotte, N.C., for Z.V. Pate, Inc.

D.L. Lansden, Robert E. Boston, Waller, Lansden, Dortch & Davis, Nashville, for C. Ralph Fontaine, Beulah Lee Fontaine, Tobin Corp., and Martha Fontaine, Executrix.

Robert S. Marquis, Bruce A. Anderson, McCampbell & Young, Knoxville, for Alma Reagan, V. Hal Reagan, Beville Reagan, and Bromlee Reagan.

George W. Miller, Denis J. Hehr, Craig H. Ulman, Jonathan L. Abram, Catherine L. LaCroix, Hogan & Hartson, Washington, D.C., Bernard E. Bernstein, Bernstein, Susano & Stair, Knoxville, for William H. Allen, Essie Applegate, Linda E. Baskett, George E. Dowden, Eugene H. Fontaine, Mildred M. Forbes, Robert Goff, Julia W. Hall, Dr. Julian R. Hardaway, Joseph W. Hart, Lucy S. Leonardi, John H. McGhee, Virginia A. Miller, O.W.K.Y. & Co., E. Wayne Pace, Kay McGehee, Lorena S. Richardson, William P. Shumate, Estate of Lucy Smith (Mabel E. Smith and Dorothy L. Smith, Co–Administrators), Irene W. Stith, Charles R. Thompson, James R. Watts, Gail H. Witten, Houston C. Woolfolk, and Frank M. Reiman.

James A. Ridley, III, Donelson M. Leake, Jackson C. Kramer, Kramer, Rayson, McVeigh, Leake & Rodgers, Knoxville, for Prival N.V.

David T. Black, Martha S.L. Black, Maryville, for Frank Cansler, Virginia F. Cansler, Richard Stair, Jr., as Trustee in Bankruptcy for Hugh Rule, d/b/a Rule Const. Co., and Hudson's Melton Shores Associates.

Howard H. Vogel, O'Neil, Park & Williamson, Knoxville, Charles J. McGuire, Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for MBank Dallas, N.A.

Bruce E. Clark, Lauretta E. Murdock, Sullivan & Cromwell, New York City, for Marine Midland Bank N.A.

J. Duane Cantrell, Spears, Moore, Rebman & Williams, Chattanooga, for Chattanooga–Hamilton County Hosp. Aurhority.

John A. Lucas, Hunton & Williams, Knoxville, for First Tennessee Bank, N.A., Trustee.

James R. Kelley, John S. Hicks, Dearborn & Ewing, Nashville, for Thomas E. Duvoisin, Liquidating Trustee.

R. Franklin Norton, Louis A. McElroy, III, Norton & Luhn, Knoxville, for Tosco Corp.

T. Maxfield Bahner, Donna L. Pierce, Chamblis, Bahner, Crutchfield, Gaston & Irvine, Hugh P. Gainer, Brian Manfield, Garner, Lewis, Cates & Pickett, John R. Seymour, George Caudle, Caldwell, Heggie & Helton, Randall L. Nelson, W. Shelly Parker, Jr., Eugene N. Collins & Associates, James C. Lee, Campbell & Campbell, Shelby R. Grubbs, J. Jeffreys Merryman, Grant, Konvalinka & Grubbs, James W. Gentry, Mattson E. Lewis, Gentry & Boehm, Chattanooga, for amicus curiae.

## OPINION

DROWOTA, Justice.

This case involves numerous parties who have intervened in the pending liquidation proceedings for the United American Bank (UAB) in Knoxville.[1] The only issue decided in this opinion is whether a purchase and assumption agreement entered into by the Federal Deposit Insurance Corporation (FDIC), acting both as the statutorily appointed receiver (FDIC–R) and in its corporate capacity (FDIC–C), and First Tennessee Bank (FTB) created a voidable or illegal preference under Tennessee law. The operative facts are essentially undisputed; the issue is fundamentally a question of law.

### I.

On February 14, 1983, the Tennessee State Commissioner of Banking (now known as the Commissioner of Financial Institutions; hereinafter, the Commissioner) de-termined that UAB was insolvent and, under the authority of T.C.A. § 45–2–1502(c)(1), closed and took possession of UAB, a federally insured state chartered banking corporation. Notice of Possession was filed on February 14, 1983. The Commissioner then appointed the FDIC as receiver pursuant to T.C.A. § 45–2–802; the FDIC duly accepted this appointment under 12 U.S.C. § 1821(e). The FDIC acts in a dual capacity in such situations, both as the receiver of the state chartered bank and as corporate insurer of the deposits held by the insolvent institution under Federal and State banking law.

Although the Commissioner did not act to close and take possession of UAB until February 14, this action had been anticipated and preparations for closure began the previous day, February 13. The FDIC sought bids from banks willing to enter into what is known as a purchase and assumption agreement by which a qualified bank would purchase assets of the insolvent and assume liabilities, including deposit liabilities, from the receiver to prevent disruption of banking services in the community, to preserve the going concern value of the failed bank, and to minimize the loss to the FDIC insurance fund. A number of banks were invited to bid for UAB, and negotiations were undertaken with FTB; these negotiations continued until an agreement was reached early on the morning of February 15, 1983. FTB entered into the Purchase and Assumption Agreement (the Agreement) on February 15 with FDIC–R and FDIC–C. The Agreement provided that FTB would assume certain liabilities and purchase certain assets of UAB; FTB acquired the assets reflected on UAB's books as of the date of closing and assumed all liabilities of UAB except those not reflected on UAB's books as of closing, those contingent in nature, or those liabilities that represented the subordinated debt of UAB. FTB also agreed to absorb the first $86.5 million in losses (representing

---

1. Hereinafter, intervenors will be referred to collectively as Claimants. These Claimants in-clude unassumed creditors, stockholders, and former directors of UAB.

the amount of FTB's bid for the going concern value of UAB); the FDIC agreed to reimburse FTB for any losses in excess of this amount. No money was actually exchanged among the parties.

On the morning of February 15, 1983, the FDIC petitioned the Knox County Chancery Court for *ex parte* approval of the sale of assets and an Order Approving Sale of Assets, Transfer of Liabilities, and Transfer of Trust Powers was entered the same day pursuant to T.C.A. §§ 45–2–802 and 45–2–1502(c). The FDIC–R's Petition for Order Approving the Sale of Assets expressly stated that FTB was not assuming all liabilities of UAB. The closure emergency that necessitated expedient approval of the Agreement also made it difficult for the parties to the Agreement to express their understanding and intentions adequately regarding unassumed liabilities; thus, after the dust settled, some shortcomings of the Agreement became apparent and the parties then entered into a Memorandum of Understanding (the Memorandum), dated March 16, 1983, to clarify the extent of FTB's assumption of liabilities and the allocation of collection responsibilities. An Order Amending Order Approving Sale of Assets was entered *ex parte* on March 16, 1983. In addition, as FTB worked with the acquired assets of UAB, their actual value was revealed to be substantially less than anticipated by the parties to the Agreement.

Furthermore, the failure of UAB precipitated a chain of additional bank failures and in May, 1983, the City and County Bank of Knox County, another large bank in the Knoxville area, was closed by the Commissioner, who took possession and appointed the FDIC as receiver. A result of this was that FTB and FDIC–R now found themselves with a number of common debtors. Collection efforts began to conflict in some instances. FTB continued making loss assistance claims under the Agreement; eventually, FTB agreed to continue to try to collect certain UAB assets even

after receiving reimbursements for losses, retaining a 40 percent fee to cover costs and remitting the remainder to the FDIC. Collection efforts, however, were not particularly successful. This arrangement did not resolve the problems with conflicting collection efforts. FTB found itself less and less in the business of banking and more and more in the position of a liquidator, incurring substantial costs and creating unpopular business relations in the community. A second Amendment to the Agreement was entered on May 20, 1983 (the Amendment). This Amendment was approved *ex parte* by the Knox County Chancery Court on June 24, 1983. The loss assistance provided to FTB was modified to shift the carrying costs for certain assets acquired by FTB to the FDIC for a limited period. Chancellor Cate's June 24 Order stated that the parties were seeking to make the Agreement and Memorandum more specific. Adjustments in the Agreement were continuing to be required in part due to the circumstances created by the failure of a number of banks in the region.

Almost a year after the Agreement was originally approved in Chancery Court in February, 1983, some Claimants began filing Motions to Intervene beginning on February 13, 1984.[2] These Claimants sought to have the *ex parte* orders set aside. They contended that the Agreement, including its amendments, created an illegal and voidable preference under Tennessee law. According to Claimants' theory, the preferential treatment arose when FDIC transferred virtually all of UAB's assets to FTB but FTB failed to assume all of UAB's liabilities, although assuming the deposit and certain other liabilities in full, leaving no fund from which FDIC–R could satisfy the claims of the unassumed creditors and other claimants on the same basis as the assumed creditors. The Chancellor conducted an intervention hearing, and on April 11, 1984, granted the Motions to Intervene.

During this period from June, 1983, when *ex parte* approval of the Amendment

2. Additional Motions to Intervene were filed after this date by other Claimants.

was granted, and the Chancellor's Order allowing Claimants' Motions to Intervene, the need to consolidate and coordinate collection efforts became increasingly clear to FTB and the FDIC. To accomplish this most effectively, FTB and the FDIC concluded that certain assets transferred under the Agreement should be reacquired by the FDIC–R. The parties entered into a Modification of Agreement (the Modification), dated June 19, 1984, and filed a Petition for Order Approving Modification of Agreement on June 22, 1984. The Modification provided that the FDIC–R would repurchase certain assets and assume the responsibility for servicing the collection of these assets; the FDIC's loss assistance to and indemnification of FTB would cease; and FTB's 40 percent costs of collection and its collection responsibilities would be terminated. FTB retained all other previously acquired UAB assets. The costs and complexities of collection would be minimized by the Modification, increasing the fund ultimately available for a *pro rata* distribution. The Modification was opposed by Claimants. Hearings were held in Chancery Court on July 27 and 30, 1984. The only witnesses were those proffered by the FDIC. On August 6, 1984, Chancellor Cate entered his Findings of Fact and Conclusions of Law; he found that the Agreement created a preference when substantially all of the assets of UAB were transferred to FTB without leaving any fund in the receivership for a ratable distribution to proven creditors. Approval of the Modification was refused by the Chancellor.

Subsequently, the FDIC filed a Motion to Alter and Amend Findings of Fact and Conclusions of Law and to Clarify Issues on August 30, 1984. On September 28, 1984, the Chancellor entered an Order denominated as a final judgment on the issue of a preference. Additional Motions and Oppositions to Motions were filed regarding the Chancellor's rulings. Finally, on December 11, 1984, the Chancellor filed an Order and a Memorandum Opinion on Motion to Alter–Amend by FDIC in which he denied the FDIC's Motions and reaffirmed

his initial ruling, with the exception that he modified his original finding of fact that the receivership had virtually no prospect of obtaining any funds for a ratable distribution. The FDIC filed its Notice of Appeal on January 4, 1985.

The Court of Appeals affirmed the Chancellor's conclusion that the agreement effected an illegal preference because when FDIC–R conveyed UAB's assets to FTB in return for FTB's absorbtion of limited losses and its assumption of UAB's liabilities to certain creditors, it left the unassumed creditors to be paid on an entirely different basis and thus was an illegal preference. Timely Applications for Permission to Appeal were filed by Claimants and the FDIC. Claimants' Applications were denied but the FDIC's Application was granted. We now reverse the Court of Appeals on the issue of whether the Agreement created an illegal preference under the laws of this State.

We note here that the one issue of fact about which the Chancellor modified his findings is crucial to this decision. Originally the Chancellor had determined that "[t]he [FDIC–R] ... has no cash or assets and virtually no prospect of obtaining any." Subsequently, on the FDIC's Motions to Alter–Amend, the Chancellor determined that the FDIC–R has a source of funds for a ratable distribution from the FDIC's insurance fund equal to the value of the assets transferred to FTB under the Agreement, plus the amount of FTB's bid for the going concern value of UAB and any other collections by FDIC–R of UAB assets currently held by FDIC–R. When the Agreement was executed and approved in February, 1983, FDIC–C became subrogated to claims of the assumed creditors, including the depositors, and became entitled to assert their claims against FDIC–R for a *pro rata* share upon distribution. The amount available for *pro rata* distribution was not decreased by the sale of UAB's assets to FTB, the number of claims assertable against the insolvent's estate remained unaffected, and the available fund for dis-

tribution was in fact increased by FTB's $86.5 million bid. FDIC–C is both a subrogated claimant and the source of the fund from which claims will eventually be paid by the receiver.

## II.

■ A receivership is an equitable proceeding over which Chancery Court exercises substantial discretionary authority. A receiver holds the funds of the insolvent as if a trustee for the benefit of claimants of the estate and has the duty to make an accounting to the court and to the creditors and claimants of the insolvent's estate. *See generally* Clark, *Law of Receivers* (3d ed. 1959), (Vol. 1) § 16, (Vol. 1) § 43, (Vol. 2) § 383. A bank receivership is conducted under the statutory authority of State and Federal law and these statutes recognize that the nature of banking services requires that a bank receiver exercise sufficient discretion in structuring and administering such a receivership "because of the special character of banks, the delicate problems involved in preserving credit, depositor relationships and confidence in the banking system." *In the Matter of the Liquidation of United Southern Bank of Nashville*, 718 S.W.2d 251, 255 (Tenn.1986) (citations omitted). A receivership is instituted because "[a] state of insolvency presupposes that the capital stock and assets are insufficient to meet ... liabilities.... The capital stock is the fund [that the claimants] trusted, and to which, with the after acquired property or assets of the corporation, they can alone look for indemnity." *Marr v. Bank of West Tennessee*, 44 Tenn. 471, 485 (1867). Consequently, insufficient funds are available to pay the claims against the insolvent in full; however, one of the receiver's duties is to maximize the fund available for a ratable distribution.[3] The statutes also contemplate that a bank receiver will attempt to minimize the loss attributable to the costs of

liquidating the assets and conducting the receivership. The receiver's actions are subject to review in Chancery Court; nevertheless, the practical difficulties of a receivership cannot be ignored. *Cf. Knaffl v. Knoxville Banking & Trust Co.*, 139 Tenn. 240, 244, 201 S.W. 775, 776 (1918).

■ The action of the receiver challenged in this case is the Agreement by which certain assets and liabilities were transferred to FTB from FDIC–R and under which FDIC–C became subrogated to the claims represented by the assumed liabilities on which loss assistance and indemnity was provided by the FDIC to FTB. The authority of the FDIC–R to enter into a purchase and assumption agreement is found in T.C.A. § 45–2–802, which states that when the FDIC accepts an appointment as receiver of a state chartered bank, "the [FDIC] as receiver shall have the right to make an emergency sale of assets of a closed bank as provided in part 15 of chapter 2 of this title." T.C.A. § 45–2–1502(c)(2) permits the Commissioner or his appointed receiver "[u]pon a determination to liquidate ... with ex parte approval of the court [to] sell all or any part of the state bank's assets to another state or national bank or to the [FDIC]." Moreover, T.C.A. § 45–2–805 provides, without reference to any prerequisite state of emergency, that the Commissioner or receiver may borrow from the FDIC, pledge or mortgage the bank's assets to the FDIC to secure a loan, or sell all or part of the assets to the FDIC for this purpose in the course of administering the receivership, "provided that where [the FDIC] is acting as ... receiver or liquidator, the order of a court of record of competent jurisdiction shall be first obtained;" however "[t]he provisions of [T.C.A. § 45–2–805] shall not be construed to limit the power of any bank, the commissioner or receivers or liquidators to pledge or sell assets in accordance with any existing law." We think

---

**3.** The principal of a *pro rata* distribution assumes that claimants ordinarily will receive less

than 100 percent of what they are owed.

these statutes give discretionary authority, co-extensive with that permitted by Federal law, to the receiver to enter into a purchase and assumption agreement. Nevertheless, the issue successfully raised by Claimants below was that the structure of the Agreement created an illegal preference when it permitted some creditors to be paid in full while leaving the unassumed creditors to be paid less than in full.

■ Evidently, purchase and assumption transactions have been utilized by the FDIC for over twenty-five years. Under 12 U.S.C. § 1823(e), "[t]he [FDIC] may take certain action to reduce the risk or avert a threatened loss to the 'Corporation' to facilitate a merger or consolidation of an insured bank with another insured bank or [to] facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank...." 3 Clark, *Law of Receivers, supra,* § 910.10, at p. 1679. *See also Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.1982); *First Empire Bank v. FDIC,* 572 F.2d 1361 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Generally, a purchasing bank assumes all the deposit liabilities and certain other liabilities that must be undertaken to preserve the going concern value of the failed bank and acquires only the acceptable or quality assets of the insolvent, leaving the receiver with the remaining assets. *See FDIC v. Ashley,* 585 F.2d 157, 159–162 (6th Cir. 1978). Assumption of all liabilities and all assets is not always required because, by definition, the insolvent does not have sufficient funds to pay its liabilities, and thus the FDIC provides loss assistance or indemnification to enable the assuming bank to meet its obligations to the assumed creditors.

"Because the time constraints often prohibit a purchasing bank from fully evaluating its risks, as well as to make a purchase and assumption an attractive business deal, the purchase and assumption agreement provides that the purchasing bank need purchase only those assets which are of the highest banking quality. Those assets not of the highest quality are returned to the receiver, resulting in the assumed liabilities exceeding the purchased assets. To equalize the difference, the FDIC as insuror purchases the returned assets from the receiver which in turn transfers the payments to the purchasing bank. The FDIC then attempts to collect on the returned assets to minimize the loss to the insurance fund. In the appropriate case, therefore, the purchase and assumption benefits all parties."

*Gunter v. Hutcheson, supra,* 674 F.2d at 865. Return of some assets to the FDIC in one of its capacities is apparently not an unusual part of the normal adjustments that follow on the heels of a purchase and assumption agreement consummated in the heat of the closure emergency.

■ Once the purchase and assumption agreement is executed, the FDIC–C steps into the shoes of the assumed creditors and acquires their claims as subrogee. Although the claims of the depositors and several other creditors have been satisfied through the purchase and assumption arrangement, these claims have not in fact been paid from the receivership fund and they have not been extinguished; these claims have only been transferred and become subrogated. When not all of the assets and liabilities are included in the purchase and assumption agreement, the FDIC–C not only holds the subrogated claims of the assumed creditors, but it also becomes the FDIC–R's surety for the value of the transferred assets in an amount equal to the value the assets of the insolvent and as long as this fund is in fact provided for distribution, plus the amount of the bid for the going concern value of the insolvent bank and other recoveries of assets, if any, remaining in the hands of the receiver, for a ratable distribution under T.C.A. § 45–2–1504, then no preference is created by a purchase and assumption agreement absent some abuse of the receiver's discretion or other misapplication

of the funds. Not only has the fund available for distribution to unassumed claimants not been diluted or diminished by this arrangement, but the eventual recovery by claimants on distribution has been increased. Thus, "the application of the money to another debt failed to diminish the assets available to general creditors. That is the aim of the provisions ... dealing with voidable preferences." *Bertram v. Citizens National Bank,* 283 F.2d 783, 785 (6th Cir.1960) (Although a bankruptcy case, the same equitable principles informing the law of voidable preferences are involved). If the FDIC had failed to make any provision to fund or failed to provide a sufficient fund for distribution by the receiver on a *pro rata* basis, then the Claimants in this case may have stood on more solid grounds on which to assert an objection to the Agreement.

■ Furthermore, T.C.A. § 45–2–1502(d)(2) voids only those transfers of assets "made after or in contemplation of ... insolvency with intent to effect a preference," and does not affect the statutory authority provided in other sections to make discretionary sales of assets with the approval of a court of competent jurisdiction. This reading of the preference section construes it *in pari materia* with the entire statutory scheme. *Cf. Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 2–3 (Tenn. 1986) (Involving priority of claims against insolvent insurance company). An intent to create a preference could be inferred where no provision of a fund for ratable distribution to unassumed creditors or claimants was made.[4] Regardless, sales of assets under court supervision, by which the receiver obtains the funds needed for a *pro rata* distribution, are clearly contemplated by the statutes; not only can the receiver sell some or all assets in the manner permitted by law, but T.C.A. § 45–2–1504(a) permits the receiver to seek court approval to compromise certain claims or to make payments on certain claims before filing a schedule of determinations. The Legislature has granted broad discretionary powers such as those found in T.C.A. §§ 45–2–1502, 45–2–1503, 45–2–1504, and other sections, which are exercised by the FDIC as receiver in tandem with the Federal statutory scheme and which are exercised under court supervision; for this Court to restrict these powers by an unduly narrow construction of the preference provision would create an unnecessary obstacle to the conduct of bank receiverships. The purpose of the preference provision is to prevent dissolution or diminution of the fund held by the receiver for *pro rata* distribution to proven creditors and claimants. *See Marr v. Bank of West Tennessee, supra,* 44 Tenn. at 484–486. Without a doubt, however, the receiver cannot "create a priority forbidden by the statute," *Petition of Walker,* 141 Tenn. 281, 285, 209 S.W. 739, 741 (1918), because "[i]t is the settled law of this state that the assets of an insolvent corporation become from the date of its assured insolvency a trust fund for equal distribution among its creditors, unless otherwise provided by law or fixed by valid contract." *Mechanics' Bank & Trust Co. v. Knoxville, Sevierville, & Eastern Railway,* 148 Tenn. 113, 123, 251 S.W. 906, 908–909 (1922). *See also Marr v. Bank of West Tennessee, supra,* at 484. The statutory scheme permits the FDIC–R to form a contract such as the Agreement in this case.

This Court has been confronted with an analogous circumstance in another case. In *Paine v. Fox,* 172 Tenn. 290, 112 S.W.2d 1 (1938), a statutorily authorized reorganization plan for an insolvent bank was challenged on somewhat similar grounds. The Court recognized that at the time reorganization was a relatively "new method of liquidation" and "a new remedy for depositors and creditors," 172 Tenn. at 300, 112 S.W.2d at 5, but, like straight liquidation, "[p]ayment of the creditors [was] still the

---

**4.** A purchase and assumption agreement that provided for assumption of all liabilities does not create a preference as a general rule.

end to be attained...." 172 Tenn. at 298, 112 S.W.2d at 4. Similarly, purchase and assumption agreements now provide still another alternative method to straight liquidation, which is by its nature a radically disruptive resolution to a bank failure. In *Paine v. Fox, supra,* some depositors were paid in full and this action was challenged as a discriminatory preference but the Court reasoned that the administrative costs of making a *pro rata* distribution to these creditors so far exceeded the amounts of their claims that permitting full recovery by certain depositors actually increased the fund available for *pro rata* distribution to the other claimaints. 172 Tenn. at 301, 301–302, 112 S.W.2d at 5.

■ The structure of this Agreement and the dual capacity in which the FDIC is permitted to act tend to distort the effect of the Agreement on the receivership fund. In the present case, the FDIC, acting in both capacities, entered into a contract with FTB by which the receiver at once sold most of the assets, obtaining a guaranty for their value from the insuror, and recovered the going concern value of UAB; FTB acquired not only UAB's assets but assumed certain liabilities, absorbing a fixed amount of loss in meeting them; the insuror became subrogee of the assumed creditors' claims, including those of the depositors, and was contractually bound to act as FDIC–R's surety for the value of the transferred assets and the amount of the bid paid by FTB when it absorbed some of the loss. The FDIC–C's subrogation is expressly contemplated in T.C.A. § 45–2–803 and required under 12 U.S.C. § 1821(g) before depositors' claims may be paid, but the status of these subrogated claims "shall be determined in accordance with the applicable provisions of State law." The FDIC's authority to make payments to itself in one capacity from itself in another capacity is expressly provided for in 12 U.S.C. § 1821(d), which states that

"[t]he Corporation as such receiver ... shall pay itself for its own account such portion of the amounts realized from

such liquidation as it shall be entitled to receive on account of its subrogation to the claims of depositors, and it shall pay to depositors and other creditors the net amounts available for distribution to them...."

If a pre-distribution purchase and assumption agreement, which is statutorily authorized as part of the conduct and administration of a receivership, provides for the disposition of losses, liabilities, and assets for a statutorily sanctioned purpose but the amount of the receivership fund available for distribution to any remaining proven, unassumed claimants is not thereby diminished, then a preference has not been created because nothing has been done to decrease the amount available for a *pro rata* distribution to satisfy the insolvent's liabilities. The claims of assumed depositors and other assumed creditors, which have become subrogated, have not been extinguished thereby.

■ A purchase and assumption agreement is one of several means available to a receivership to establish a liquid fund from which to make a ratable distribution; it may also be used to transfer all liabilities. In this case, however, no distribution has yet occurred and the receiver is still in the process of collecting assets, preparing and filing a schedule of determinations, giving notices, and otherwise generally winding up the receivership under T.C.A. §§ 45–2–1502 and 45–2–1504. *Cf. In the Matter of the Liquidation of United Southern Bank of Nashville, supra,* at 254. The performance of the receiver's duties must be allowed sufficient discretion to structure the liquidation in the most efficient manner within the latitude provided by the statutes controlling a bank receivership and the principles of equity generally applicable to a receivership. *Cf. Swepston v. Exchange and Deposit Bank,* 77 Tenn. 713, 722–723 (1882). As long as the receiver takes the necessary steps to provide a fund for *pro rata* satisfaction of unassumed claims from an undiminished (or enhanced) fund, a purchase and as-

sumption agreement that does not provide for assumption of all liabilities does not *per se* constitute a voidable or illegal preference under T.C.A. § 42–5–1502(d)(2). As the Ninth Circuit Court of Appeals stated in *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538 (9th Cir.1987), referring to its opinion in *First Empire Bank v. FDIC, supra,* in which that court

> "concluded that the receiver could not enter into a purchase and assumption agreement that did not provide for the assumption of all creditors' claims. [The court] made clear that if the purchase and assumption agreement had reserved sufficient assets in the receivership to allow distribution to unassumed creditors, then the distribution would have been upheld. Because the FDIC had not done so, we required it to compensate the creditors whose claims were not assumed by the acquiring bank. 572 F.2d at 1371."

815 F.2d at 541–542. We conclude that the FDIC will provide the necessary fund for a *pro rata* distribution. One of the maxims of equity is that equity imputes an intent to fulfill an obligation. The Chancellor has the authority to enforce this obligation.

### III.

■■■ A state bank receiver is authorized to enter into a purchase and assumption agreement under the statutes controlling bank receiverships, but where such an agreement is structured so that not all liabilities are assumed by the purchasing bank, the receiver must retain a source of a fund from which a *pro rata* distribution can be made to satisfy all unassumed proven and subrogated claims. If such a fund does not exist either in the form of a guaranty or from some other source of payment, precluding any ratable distribution to unassumed creditors, then

> "[a] Court of Equity will not tolerate such a manifest violation of the rules of

natural justice to be practiced by one creditor upon all the others, who stand upon the same ground occupied by himself, as to a common fund. A single creditor would, by no pretended legal technicality, be allowed to destroy the fund, or appropriate it all to his benefit, and thereby totally defeat all the others...."

*Marr v. Bank of West Tennessee, supra,* at 486. *See also Woodbridge Plaza v. Bank of Irvine, supra,* 815 F.2d at 541–542; *Hibernia National Bank v. FDIC,* 733 F.2d 1403, 1407 (10th Cir.1984).

We think that Claimants' contentions are premature. The Chancellor has the authority to compel the receiver to make an accounting, in which the value of the assets can be determined, T.C.A. § 45–2–1502(b)(2), and to order FDIC–C, which has in effect become contractually bound to the receiver as if its surety under the Agreement and is thus subject to State jurisdiction as a party to a contract entered into under State law, to establish a fund equal to the determined value of these assets (plus the previously fixed amount of FTB's bid for the going concern value of UAB).[5] This duty to account may be invoked by any claimant:

> "Any party to the cause might have moved for such an account, and it was the duty of the receiver, himself ... to have made a full report.... In no other way can the parties know what their rights are, or the court act upon their rights understandingly."

*Lowe v. Lowe,* 1 Tenn.Chan. 515, 517 (1873). The Chancellor should have due regard for the complexities of the receiver's duties and the totality of the circumstances in which the receiver finds itself, especially in this case, which involves massive bank failures. The Chancellor also has the authority to prevent the receiver or its surety from treating Claimants arbitrarily or inequitably. Under T.C.A.

---

**5.** Absent some abuse of discretion or intentional misappropriation, FDIC–C as surety can be exposed to no further obligation than to fund the receivership with the value of UAB's assets plus the amount of FTB's bid for UAB as a going concern.

§ 45-2-1504(g), Claimants will have the opportunity to file objections to the determinations made by the receiver; at that time, proper inquiry may be made into the status of their claims under Tennessee law. The Chancellor has sufficient authority and discretion to assure that the ultimate distribution of the available fund will be equitable.

Accordingly, we reverse the judgments of the courts below and hold that the Purchase and Assumption agreement, as presently structured among FTB, FDIC–R, and FDIC–C, does not of itself create an illegal preference under the law of this State. We remand this case for further proceedings not inconsistent with this opinion. The costs of this appeal are taxed to Appellant.

HARBISON, C.J., and FONES and BROCK, JJ., concur.

R. VANN OWENS, Special Justice, dissents. See separate opinion filed.

R. VANN OWENS, Special Justice, dissenting.

I respectfully dissent to the result reached in this case.

I concur in the well reasoned logic of the majority opinion and I concur in the rules of law expressed therein. Tennessee Law does not require every creditor to be treated *exactly* the same. *Paine v. Fox*, 172 Tenn. 290, 112 S.W.2d 1 (1938). Such seems allowable so long as: (1) there is no *intent* to effect a preference; (2) there is a logical and reasonable basis to treat certain creditors differently; and (3) no creditors are prejudiced. If certain creditors receive a windfall from a collateral source, then others cannot complain. The continuation and maintenance of a failed banking facility is a worthwhile and desirable objective. It should not be made impossible by a requirement that all creditors must be paid in full.

Thus, the utilization by FDIC of a so-called "hybrid" Purchase and Assumption Agreement would comply, in my opinion, with Tennessee Law if such were reasonable. Such would require the FDIC to place funds in the hands of the Receiver initially in an amount reasonably sufficient to pay out the anticipated liquidation values. Distribution(s) could take place promptly and interest could be earned on the funds during any delay.

To this extent, I concur in the majority opinion that the Trial Judge was in error in decreeing 100% distributions solely on the basis of insuring that all creditors were treated *equally.*

However, a Trial Judge's correct judgment should not be reversed simply because it may have been predicated upon an erroneous reason. *Cherokee Insurance Company v. U.S. Fire Insurance Company,* 559 S.W.2d 337 (Tenn.App.1977).

The facts of this case, in my opinion, do not support the majority's conclusion that there has been no preferential treatment, nor prejudice to the unassumed creditors. The P. & A. left no assets in the hands of the Receiver and it decisively preferred FDIC in its corporate capacity. If a fund exists for pro rata distribution, it is based upon the liability of the Receiver and not upon any preservation of assets. Assuming that the claims asserted herein are bona fide and provable, the unassumed creditors have been prejudiced to an incalculable extent. Furthermore, it appears that the FDIC as Receiver has subjected its duties and responsibilities to the interest of FDIC in its corporate capacity.

As to the existence of the source of funds for distribution, the Chancellor found:

FDIC Corporation has told the Court and stated in its brief that, "The FDIC is willing to adhere to Tennessee Law and make payments to all bona fide creditors on a pro rata basis ... If a surcharge is appropriate, the appropriate amount is enough to establish a pro rata distribution to those persons who have been recognized as bona fide creditors of the receivership estate—which the FDIC is willing to voluntarily pay."

Therefore, the majority gives credence to the "willingness" of the FDIC and con-

strues such as a fund available for distribution. However, the Purchase and Assumption Agreement obviously transferred *all* assets of United American Bank to the First Tennessee Bank and the FDIC in its corporate capacity. It was only after the intervening petitioners filed their claim that this nebulous fund came into existence. In its initial response to the intervening petition, FDIC contended that "pro rata payment" of unassumed creditors "is a discretionary policy not subject to review in this Court." Later, upon the invitation of the Chancellor to enter an Order providing for this fund, FDIC refused to approve such unless it encompassed *its* interpretation of "pro rata." Before the Trial Court, FDIC—as a fiduciary for the creditors—threatened to rely upon sovereign immunity and pay nothing unless the Chancellor accepted its determination of its responsibilities as Receiver. In the Court of Appeals, FDIC asserted and relied upon the case of *FDIC v. Citizens Bank and Trust Company*, 592 F.2d 364 (7th Cir.1979). wherein that Court held that the FDIC was immune from creditors' tort claim that they had wrongfully transferred as Receiver assets of an insolvent bank to itself in its corporate capacity. The FDIC has consistently maintained that it would assert sovereign immunity if the Court did not accept its interpretation of its obligations as a fiduciary. Certainly, the willingness, or intent, of FDIC to pay liquidation values was not such that the creditors could put in the bank or borrow upon it. The liquidation officer for FDIC–R testified that the Receivership had insufficient funds "to even buy an ice cream cone."

If United American Bank had been liquidated, FDIC would have been responsible to pay large sums to depositors promptly. "... payment of the insured deposit in such bank shall be made by the corporation as soon as possible ..." 12 U.S.C.A. § 1821(f). By the provisions of the Purchase and Assumption Agreement used, First Tennessee Bank assumed all of the depositor liability and certain of the creditors. Thus, any outlay of funds by the

FDIC as insuror was postponed until FTB sustained losses "in excess of 86.5 million." P. & A. Sec. 3.2. Payments to FTB by the corporation in its insuror capacity are to be charged with interest. P. & A. Sec. 3.3. No provision, of course, exists for the payment of interest to the unassumed creditors. Clearly, FDIC–C was preferred in the Purchase and Assumption Agreement.

FDIC strongly argued that the unassumed creditors could not possibly be prejudiced as they will ultimately receive the same distribution that they would have received in a straight liquidation plus a pro rata portion of the enhanced value paid by First Tennessee Bank. Clearly, the unassumed creditors have been prejudiced by being required to file suit to seek any payment. In straight liquidation, they would have undoubtedly received partial distributions. Here, they are unlikely to receive any payment until the FDIC completely winds up all of the proceedings. The determination of the "value" of the failed bank and the cost of collection are strictly within the control of FDIC in its corporate capacity. It is difficult to ascertain how the Trial Judge could ever ascertain the reasonableness of these amounts.

The majority place great confidence in the Trial Judge's ability to insure that proper accountings can be obtained and, ultimately, a proper pro rata distribution made. However, until FDIC–C concludes all proceedings to determine what "pro rata" means, FDIC–R has no assets upon which to make any accounting. FDIC–C, who holds all of the assets not transferred to FTB, is not accountable to State Court. 12 U.S.C.A. § 1819; *FDIC v. Ashley*, 585 F.2d 157 (6th Cir.1978). In fact, the Chancellor has no control over the collection of the assets or the payment of liabilities outside the Receivership. As stated in *Ashley*,

"... the assignment agreement eliminated the need for constant Court supervision of a Receivership. A Receiver needs Court authority for the disbursement of funds to pay expenses, the negotiations of settlements, the issuance of

accountings, and the payment, pro rata, of creditors. By virtue of the assignment agreement, the FDIC owned the 'unacceptable assets' and could liquidate them without Court supervision."

Thus, FDIC–C has unbridled discretion to file suit, compromise claims and incur expenses. Yet, these decisions are determinative of what "pro rata" means in this case.

It is clear that the "chain of additional bank failures" referred to in the majority opinion has complicated the job of FDIC. Yet, from the record before this Court, there are inadequate accounting procedures to properly allocate the collection of assets between the numerous failed banks.

The law is abundantly clear that the FDIC is allowed to operate in separate capacities as Receiver and Insuror. 12 USCA § 1811; *FDIC v. Ashley, supra; FDIC v. Godshall*, 558 F.2d 220 (4th Cir. 1977). Such functions are entirely separate and one is accountable to Federal Courts and the other to State Courts. As a Receiver, FDIC is a fiduciary to all of the creditors. In its Corporate, or Insuror, capacity, the obligations are to fulfill the statutory requirements for payment and preserve the insurance fund. We have a distinct conflict of interests and, as Receiver, FDIC has consistently taken the position of its counter-part, FDIC–C, in these proceedings. Their separate identities have so merged as to be indistinguishable. It would appear: (1) that FDIC–C exercises complete dominion over FDIC–R, (2) such control has caused FDIC to violate its legal duties, and (3) the unassumed creditors have been injured. I would hold FDIC–R as the alter ego of FDIC–C. See *Electric Power Board of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522 (Tenn.1985).

Under the facts of this case, I would concur in the Chancellor's determination that it is "impossible to unscramble the eggs." I would affirm the determinations made by the Trial Court and the Court of Appeals.

## ORDER

DROWOTA, Justice.

Pursuant to Rule 39 of the Tennessee Rules of Appellate Procedure, C. Ralph Fontaine, et al., MBank Dallas, N.A., and Thomas E. DuVoisin, Liquidating Trustee of Southern Industrial Banking Corporation, have filed Petitions to Rehear. After consideration of same, the Court is of the opinion that the Petitions should be and the same hereby are overruled at the cost of Petitioners. The members of the Court adhered to the positions stated in the original opinion filed in this cause on September 8, 1987.

HARBISON, C.J., and FONES and BROCK, JJ., concur.

R. VANN OWENS, Special Justice, dissents.